AO 106 (Rev. 04/10)  Application for a Search Warrant



# UNITED STATES DISTRICT COURT
### for the
### Central District of California

**UNDER SEAL**

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. 8:19-MJ-244 |
| | ) | |
| 1910 West Sunset Boulevard, Suite 450, Los Angeles, California 90026 | ) ) ) ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

*See Attachment A-3*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized):*

*See Attachment B-3*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of:

| *Code Section* | *Offense Description* |
|---|---|
| 26 U.S.C. § 7201 | Attempt to Evade or Defeat Tax |
| 26 U.S.C. § 7202 | Willful Failure to Collect or Pay Over Tax |
| 26 U.S.C. § 7203 | Willful Failure to Pay Tax or File Return |
| 26 U.S.C. § 7212 | Interference with Administration of Internal Revenue Laws |
| 18 U.S.C. § 152 | Concealment of Assets in Bankruptcy |
| 18 U.S.C. § 157 | Bankruptcy Fraud |
| 18 U.S.C. § 371 | Conspiracy |
| 18 U.S.C. § 1001 | False Statements |
| 18 U.S.C. § 1014 | False Statement to a Bank or Other Federally Insured Institution |
| 18 U.S.C. § 1028A | Aggravated Identity Theft |
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1344 | Bank Fraud |
| 18 U.S.C. § 1957 | Money Laundering |

///

///

///

The application is based on these facts:

    *See attached Affidavit*

    ☒ Continued on the attached sheet.

☐ Delayed notice of_____days (*give exact ending date if more than 30 days:*_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

IRS CI Special Agent Remoun Karlous
_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____

_____
*Judge's signature*

City and state: ___Santa Ana, CA_____

United States Magistrate Judge Douglas F. McCormick
_____
*Printed name and title*

AUSAs:  Julian L. André (213.894.6683) & Brett A. Sagel (714.338.3598)

## ATTACHMENT A-3

**PREMISES TO BE SEARCHED**

The premises to be searched is Suite 450 of the commercial office building located at 1910 West Sunset Boulevard, Los Angeles, California 90026 ("SUBJECT PREMISES 3").  SUBJECT PREMISES 3 is situated on the south side of Sunset Boulevard between Park Avenue to the west and the overpass intersection of Glendale Boulevard to the east.  The building consists of one (1) ground floor and seven (7) floors above the ground floor.  The "citibank" commercial sign is affixed to the top and directly above the seventh (7th) floor of the exterior north, east, and west sides of the building.

SUBJECT PREMISES 3 has a pedestrian entrance on Glendale Boulevard or the east side of the building, and a pedestrian front entrance located and accessible from the south side of Sunset Boulevard, with that entrance facing north.  The fixed glass pane above the two pedestrian doors contains three lines of white lettering that has "1910" on the first line, "Rolf K. McPherson" on the second line, and "BUILDING" on the third line.

On the east side of the SUBJECT PREMISES 3's lobby, an electronic directory exists listing the building's tenants and their respective suites.  The X-Law Group, P.C. is listed in the electronic directory with the number 450, and located on the fourth floor.

i

**ATTACHMENT B-3**

I.   **ITEMS TO BE SEIZED**

1.   Evidence, contraband, fruits, and/or instrumentalities of violations of 26 U.S.C. § 7201 (attempt to evade or defeat tax); 26 U.S.C. § 7202 (willful failure to collect or pay over tax); 26 U.S.C. § 7203 (willful failure to pay tax or file return); 26 U.S.C. § 7212 (interference with administration of internal revenue laws); 18 U.S.C. § 152 (concealment of assets in bankruptcy); 18 U.S.C. § 157 (bankruptcy fraud); 18 U.S.C. § 371 (conspiracy); 18 U.S.C. § 1001 (false statements); 18 U.S.C. § 1014 (false statement to a bank or other federally insured institution); 18 U.S.C. § 1028A (aggravated identity theft); 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 1344 (bank fraud); and 18 U.S.C. § 1957 (money laundering) (the "Subject Offenses"), namely:

a.   Records, documents, programs, applications, or materials from January 2011 through the present relating to the ownership of Global Baristas US, LLC ("GBUS"); Global Baristas, LLC ("GB LLC"); GB Autosport, LLC ("GB Auto"); GB Hospitality LLC ("GB Hospitality"); Doppio Inc. ("Doppio"); Eagan Avenatti LLP ("EA LLP"); and Avenatti & Associates, APC ("A&A") (collectively, the "Subject Entities").

b.   Records, documents, programs, applications, or materials from January 2011 through the present relating to Michael J. Avenatti's ("AVENATTI") control or management of any

i

of the Subject Entities and/or The X-Law Group, PC ("X-Law Group").

   c. Records, documents, programs, applications, or materials from January 2011 through the present relating to the organizational or management structure of any of the Subject Entities and/or X-Law Group.

   d. Records, documents, programs, applications, or materials from January 2011 through the present relating to the finances of any of the Subject Entities, including assets, income, liabilities, accounts receivable, accounts payable, and expenses.

   e. Records, documents, programs, applications, or materials from January 2011 through the present relating to the personal finances of Michael Avenatti ("AVENATTI"), including information relating to AVENATTI's assets, debts, income, expenses, and net worth.

   f. Records, documents, programs, applications, or materials from January 2011 through the present relating to the accounting records for AVENATTI and/or any of the Subject Entities, including any Microsoft Dynamics NAV, QuickBooks, or other electronic accounting data, files, or records.

   g. Records, documents, programs, applications, or materials from January 201 through the present relating to any financial transactions, including any proposed or potential

ii

financial transactions, involving any of the Subject Entities, and/or AVENATTI.

    h.   Records, documents, programs, applications, or materials from January 2011 through the present relating to any payments, checks, credits, wire transfers, commodities, services, or other things of value paid, provided, delivered, or transferred, directly or indirectly, to AVENATTI and/or any of the Subject Entities

    i.   Records, documents, programs, applications, or materials from January 2011 through the present relating to any financial relationship between AVENATTI and/or any of the Subject Entities on one hand and X-Law Group and/or Filippo Marchino ("MARCHINO") on the other hand.

    j.   Records, documents, programs, applications, or materials from January 2011 through the present relating to financial decisions AVENATTI and/or JUDY REGNIER ("REGNIER") made on behalf of any of the Subject Entities, including decisions to authorize payments on behalf of any of the Subject Entities and transfer money to or from any of the Subject Entities.

    k.   Records, documents, programs, applications, or materials from January 2011 through the present relating to communications between AVENATTI and/or REGNIER and any financial institution regarding the transfer of funds to or from any

account associated with AVENATTI and/or any of the Subject
Entities.

l.   Records, documents, programs, applications, or
materials from January 2011 through the present relating to any
loans or other financing agreements, including any proposed or
potential loans or other financing agreements, involving any of
the Subject Entities and/or AVENATTI.

m.   Records, documents, programs, applications, or
materials from January 2011 through the present relating to the
payroll obligations of the Subject Entities.

n.   Non-privileged records, documents, programs,
applications, or materials from January 2011 through the present
relating to the federal, state, and/or local tax obligations,
tax returns, tax liabilities, or tax payments of any of the
Subject Entities and/or AVENATTI.

o.   Non-privileged records, documents, programs,
applications, or materials from January 2011 through the present
relating to any liens, levies, garnishments, judgments,
encumbrances, or tax-related investigations or actions
associated with any of the Subject Entities and/or AVENATTI.

p.   Records, documents, programs, applications, or
materials from January 2011 through the present relating to
attorneys' fees or costs earned or collected by EA LLP, A&A,
and/or AVENATTI, including attorney-client fee contracts,

engagement letters, fee agreements, cost-sharing agreements, fee-sharing agreements, settlement agreements, and client billing records, but excluding any such records relating to the representations of Stephanie Clifford or Julie Swetnick.

q.   Records, documents, programs, applications, or materials from January 2011 through the present relating to any of the Subject Entities' and/or AVENATTI's contractual relationships, including drafts and final versions of any executed, proposed, or potential contracts and agreements, bills of sale, correspondence regarding payments, and correspondence regarding the cancellation or modification of contracts and/or agreements.

r.   Records, documents, programs, applications, or materials from January 2011 through the present relating to any of the Subject Entities' and/or AVENATTI's bank account information.

s.   Records, documents, programs, applications, or materials from January 2011 through the present relating to the physical whereabouts of AVENATTI, and/or REGNIER, including calendars and calendar entries.

t.   Records, documents, programs, applications, or materials from January 1, 2014, to the present relating to AVENATTI and/or EA LLP's representation of G.B., including the approximately $1.6 million settlement payment that was

transferred to one of AVENATTI's City National Bank attorney trust account in or around January 2018.

u.   Records, documents, programs, applications, or materials from January 1, 2017, to the present relating to AVENATTI's, EA LLP's, X-Law Group, and/or MARCHINO's representation of M.P. and L.T., including the approximately $8,146,288 payment that was transferred to one of AVENATTI's City National Bank attorney trust accounts in or around March 2018.

v.   Records, documents, programs, applications, or materials from January 2013 through the present relating to the payroll and tax preparation services that Paychex provided to EA LLP and/or A&A, including any records, documents, programs, applications, or materials relating to changes in the payroll and tax services to be provided by Paychex.

w.   Records, documents, programs, applications, or materials from January 2013 through the present relating to the payroll and tax preparation services that Ceridian HCM Inc. ("Ceridian") provided to GBUS, including any records, documents, programs, applications, or materials relating to changes in the payroll and tax services to be provided by Ceridian.

x.   Records, documents, programs, applications, or materials from January 2013 through the present relating to the sale or purchase of TC Global, Inc. or Tully's Coffee.

y.   Records, documents, programs, applications, or materials from January 2013 through the present relating to the purchase or sale, including any proposed or attempted purchase or sale, of GBUS, GB LLC, or Doppio.

z.   Records, documents, programs, applications, or materials from January 2013 through the present relating to value of GBUS or GB LLC.

aa.   Records, documents, programs, applications, or materials from January 2013 through the present relating to GBUS's and GB LLC's merchant credit card processing accounts (the "merchant accounts"), including contracts, agreements, account applications, and correspondence regarding changes to the merchant accounts.

bb.   Records, documents, programs, applications, or materials from January 2011 through the present relating to the sale, rental, lease, purchase, maintenance, renovation, or remodeling of any of AVENATTI's residences, including his residences in Newport Beach, California; Laguna Beach, California; and Los Angeles, California.

cc.   Records, documents, programs, applications, or materials from January 2011 through the present relating to continuing legal education ("CLE") courses taken by AVENATTI, including any professional responsibility CLE courses, ethics CLE courses, or tax CLE courses.

dd.  Records, documents, programs, applications, or materials from January 2011 through the present relating to any of the Subject Entities' employee handbooks or manuals, employment contracts, compensation records, and employee lists.

ee.  Records, documents, programs, applications, or materials relating to any locations or services used by AVENATTI and/or any of the Subject Entities to store physical or electronic records.

ff.  Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense/s, and forensic copies thereof.

gg.  With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.  evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.  evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.    evidence of the times the device was used;

vi.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.    records of or information about Internet Protocol addresses used by the device;

ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal

ix

digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.   SEARCH PROCEDURES FOR HANDLING POTENTIALLY PRIVILEGED INFORMATION

4.   The following procedures will be followed at the time of the search in order to avoid unnecessary disclosures of any privileged attorney-client communications or work product:

### A.   Non-Digital Evidence

5.   Law enforcement personnel conducting the investigation ("the Investigation Team") may be present at the search, but may not search or review any item prior to it being given to them by the "Privilege Review Team" (previously designated individual(s) not participating in the investigation of the case).

6.   The Privilege Review Team will review documents to see whether or not the document appears to contain or refer to communications between AVENATTI, REGNIER,  MARCHINO and/or any other lawyers from EA LLP, A&A, and the X-Law Group on the one hand and any person on the other hand; contain the work product

x

of AVENATTI, REGNIER, MARCHINO, and any other lawyers from EA LLP, A&A, and the X-Law Group; or contain communications or documents relating to the following law firms' representation of AVENATTI, EA LLP, or A&A:  (a) Foster Pepper PLLC; (b) Osborn Machler PLLC; (c) Eisenhower Carlson PLLC; (d) Talmadge/Fitzpatrick/ Tribe, PPLC; (e) The Brager Tax Law Group; (f) SulmeyerKupetz; (g) Baker & Hostetler LLP; (h) Shulman Hodges & Bastian LLP; (i) Legal & Tax Consulting Group; (j) Pachulski Stang Ziehl & Jones LLP; (k) Foley & Lardner LLP; (l) Raines Feldman, LLP; and (m) Pansky Markle Attorneys at Law (collectively, the "potentially privileged information").  Those documents not containing or referring to such communications or work product may be turned over to the Investigation Team for review.

7.    In consultation with a Privilege Review Team Assistant United States Attorney ("PRTAUSA"), if appropriate, the Privilege Review Team member will review any document identified as appearing to contain potentially privileged information to confirm that it contains potentially privileged information.  If it does not, it may be returned to an Investigation Team member. If a member of the Privilege Review Team confirms that a document contains potentially privileged information, then the member will review only as much of the document as is necessary to determine whether or not the document is within the scope of the warrant.  Those documents which contain potentially privileged information but are not within the scope of the warrant will be set aside and will not be subject to further

review or seizure absent subsequent authorization.  Those documents which contain potentially privileged information and are within the scope of the warrant will be seized and sealed together in an enclosure, the outer portion of which will be marked as containing potentially privileged information.  The Privilege Review Team member will also make sure that the locations where the documents containing potentially privileged information were seized have been documented.

8.   The seized documents containing potentially privileged information will be delivered to the United States Attorney's Office for further review by a PRTAUSA.  If that review reveals that a document does not contain potentially privileged information, or that an exception to the privilege applies, the document may be returned to the Investigation Team.  If appropriate based on review of particular documents, the PRTAUSA may apply to the court for a finding with respect to the particular documents that no privilege, or an exception to the privilege, applies.

**B.   Digital Evidence**

9.   The Privilege Review Team will search for digital devices capable of being used to facilitate the Subject Offenses or capable of containing data falling within the scope of the items to be seized.  The Privilege Review Team will then review the identified digital devices as set forth herein.  The Investigation Team will review only digital device data which has been released by the Privilege Review Team.

10.  The Privilege Review Team will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be searched at that location.

11.  The Privilege Review Team and the Investigation Team shall complete both stages of the search discussed herein as soon as is practicable but not to exceed 180 days from the date of execution of the warrant.  The government will not search the digital device(s) beyond this 180-day period without obtaining an extension of time order from the Court.

12.  The Investigation Team will provide the Privilege Review Team and/or appropriate litigation support personnel[1] with a list of "scope key words" to search for on the digital devices, to include words relating to the items to be seized as detailed above.  The Privilege Review Team will conduct an initial review of the digital devices using the scope key words, and by using search protocols specifically chosen to identify documents and data that appear to be within the scope of the warrant.  The Privilege Review Team may also do a more detailed quality check of this data and the results of this initial review, to ensure that the key word search is effective. Documents and data that are identified by this initial review, after quality check, as not within the scope of the warrant will

---

[1] Litigation support personnel and computer forensics agents or personnel, including IRS Computer Investigative Specialists, are authorized to assist both the Privilege Review Team and the Investigation Team in processing, filtering, and transferring documents and data seized during the execution of the warrant.

be maintained under seal and not further reviewed absent
subsequent authorization.

13.  The Investigation Team will also provide the Privilege
Review Team with a list of "privilege key words" to search for
among the documents and data that are identified by the initial
review and quality check described above as appearing to fall
within the scope of the warrant, to include specific words
associated with AVENATTI, REGNIER, MARCHINO, and any of the
following law firms (a) EA LLP; (b) A&A; (c) X-Law Group; (d)
Foster Pepper PLLC; (e) Osborn Machler PLLC; (f) Eisenhower
Carlson PLLC; (g) Talmadge/Fitzpatrick/ Tribe, PPLC; (h) The
Brager Tax Law Group; (i) SulmeyerKupetz; (j) Baker & Hostetler
LLP; (k) Shulman Hodges & Bastian LLP; (l) Legal & Tax
Consulting Group; (m) Pachulski Stang Ziehl & Jones LLP; (n)
Foley & Lardner LLP; (o) Raines Feldman, LLP; and (p) Pansky
Markle Attorneys at Law.  The privilege key words shall also
include the above referenced law firms' domain names and
lawyers' email addresses, and generic words such as
"privileged," "work product."  The Privilege Review Team will
conduct a review of these documents and data using the privilege
key words, and by using search protocols specifically chosen to
identify documents and data containing potentially privileged
information.  Documents or data which are identified by this
review as not potentially privileged may be given to the
Investigation Team.

14.  Documents or data that the privilege key word searches
identify as potentially privileged will be reviewed by a

Privilege Review Team member to confirm that they contain
potentially privileged information.  Documents or data that are
determined by this review not to be potentially privileged may
be given to the Investigation Team.  Documents or data that are
determined by this review to be potentially privileged will be
given to the United States Attorney's Office for further review
by a PRTAUSA.  Documents or data identified by the PRTAUSA after
review as not potentially privileged may be given to the
Investigation Team.  If, after review, the PRTAUSA determines it
to be appropriate, the PRTAUSA may apply to the court for a
finding with respect to particular documents or data that no
privilege, or an exception to the privilege, applies.  Documents
or data that are the subject of such a finding may be given to
the Investigation Team.

     15.  Documents or data identified by the PRTAUSA(s) after
review as privileged (that are not subject to a finding by a
court of no privilege or an exception to the privilege) or
potentially privileged and outside the scope of the items to be
seized shall be segregated and sealed together in an enclosure,
the outer portion of which will be marked as containing
potentially privileged information, and maintained by the
investigative agency.  Such data or documents shall not be
accessible by or given to the Investigation Team at any time
absent authorization of the Court.  However, the Privilege
Review Team may, in its discretion, store the privileged and
potentially privileged data and documents in a folder or a set
of folders in a document review platform database, such as

Relativity or Eclipse, that remains inaccessible to the Investigation Team.  The Privilege Review Team's access to this separate document review platform database shall cease upon expiration of the warrant.  However, litigation support personnel from the United States Attorney's Office, United States Department of Justice, and/or the investigating agency may continue to access this separately-maintained document review database for the purpose of database maintenance.

16.  The Investigation Team will search only the documents and data that the Privilege Review Team provides to the Investigation Team at any step listed above in order to locate documents and data that are within the scope of the search warrant.  The Investigation Team does not have to wait until the entire privilege review is concluded to begin its review for documents and data that are within the scope of the search warrant.  The Privilege Review Team may also conduct the search for documents and data within the scope of the search warrant if that is more efficient.  This second "scope" review is intended only to ensure that the initial scope key word review successfully eliminated data outside the scope of the search warrant from seizure.

C.    **Additional Privilege Review Procedures**

17.  The Privilege Review Team will segregate any identifiable documents and/or data relating to Stephanie Clifford v. Donald J. Trump, No. 2:18-CV-2217-SJO-FFM (C.D. Cal.), the representation of Stephanie Clifford, and/or the representation of Julie Swetnick.  Such documents and/or data

will be maintained under seal by the investigating agency
without further review as set forth in paragraphs 7 and 15 above
absent subsequent authorization from the Court.   This provision,
however, shall not preclude the Privilege Review Team or
Investigation Team from reviewing financial and accounting
records covered by paragraphs 1.d, 1.f, 1.g, and 1.r above,
which reference the representations of Ms. Clifford or Ms.
Swetnick.

18.   To the extent that any documents and/or data covered
by paragraph 1.p above, such as attorney-client fee contracts,
engagement letters, and client billing records, contain
information that is potentially protected by the attorney-client
privileged or the attorney-work-product doctrine, the Privilege
Review Team shall redact all such potentially privileged
information from the documents or data before releasing the
documents and/or data to the Investigation Team unless the
specific client agrees to waive the attorney-client privilege.

19.   If, upon review, a member of the Investigation Team
determines that a document or data appears to contain
potentially privileged information, the Investigation Team
member shall discontinue its review of the document or data and
shall immediately notify a member of the Privilege Review Team.
The Investigation Team member may record identifying information
regarding the potentially privileged document or data that is
reasonably necessary to identify the document or data for the
Privilege Review Team.   The Investigation Team shall not further
review any documents or data that appears to contain such

potentially privileged information until after the Privilege
Review Team has completed its review of the additional
potentially privileged information discovered by the
Investigation Team member.

20. In performing the reviews, both the Privilege Review
Team and the Investigation Team may:

a. search for and attempt to recover deleted,
"hidden," or encrypted data;

b. use tools to exclude normal operating system
files and standard third-party software that do not need to be
searched; and

c. use forensic examination and searching tools,
such as "EnCase," "FTK" (Forensic Tool Kit), Nuix, Axiom,
Relativity, and Eclipse, which tools may use hashing and other
sophisticated techniques.

21. If either the Privilege Review Team or the
Investigation Team, while searching a digital device, encounters
immediately apparent contraband or other evidence of a crime
outside the scope of the items to be seized, they shall
immediately discontinue the search of that device pending
further order of the Court and shall make and retain notes
detailing how the contraband or other evidence of a crime was
encountered, including how it was immediately apparent
contraband or evidence of a crime.

22. If the search determines that a digital device does
not contain any data falling within the list of items to be

seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

23. If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

24. If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the items to be seized (after the time for searching the device has expired) absent further court order.

25. The government may retain also a digital device if the government, within 14 days following the time period authorized by the Court for completing the search, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

26. After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

27.  In order to search for data capable of being read or interpreted by a digital device, the Investigation Team is authorized to seize the following items:

a.  Any digital device capable of being used to commit, further or store evidence of the offense(s) listed above;

b.  Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.  Any magnetic, electronic, or optical storage device capable of storing digital data;

d.  Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.  Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.  Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.  Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

28.  During the execution of this search warrant, with respect to a biometric sensor-enabled device that is located at the SUBJECT PREMISES and falls within the scope of the warrant, the law enforcement personnel are authorized to: (1) depress the

xx

thumb- and/or fingerprints of AVENATTI, REGNIER, and/or MARCHINO onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of the face of AVENATTI, REGNIER, and/or MARCHINO his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.

29. The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

**III.  REQUESTS FOR APPOINTMENT OF A SPECIAL MASTER**

30. To the extent that AVENATTI, REGNIER, EA LLP, A&A, MARCHINO, and/or X-Law Group intend to request that a special master be appointed to handle the review of any potentially privileged information seized during the execution of this Search Warrant, such a request must be filed with this Court within seven days of the execution of this Search Warrant.  The government will then have seven days to file any opposition to such a request.

Any request for the appointment of a special master must, at a minimum, address the following issues:  (a) the legal basis for the request; (b) the anticipated role of the special master, should one be appointed; (c) proposed search and review procedures to be followed by the special master, should one be

appointed; (d) proposed procedures for the selection of a special master; (e) the names of at least three proposed special masters; and (f) the party's ability to pay for any costs and fees incurred by a special master.

## AFFIDAVIT

I, Remoun Karlous, being duly sworn, declare and state as follows:

## I.   INTRODUCTION

1.    I am a Special Agent ("SA") with the Internal Revenue Service-Criminal Investigation ("IRS-CI") in the Los Angeles Field Office and have been so employed since April 1995.  As an IRS-CI SA, I have investigated numerous cases involving criminal violations of Title 18, Title 21, Title 26, and Title 31 of the United States Code, which have resulted in seizure, search, and arrest warrants.  In particular, I have investigated cases involving money laundering, international money laundering, securities fraud, tax evasion (domestic and international cases), and subscribing to false tax returns.

## II. PURPOSE OF AFFIDAVIT

2.    This affidavit is submitted in support of the following:

a.    An application for a warrant to search the residence of Michael J. Avenatti ("AVENATTI") located at 10000 Santa Monica Boulevard, Unit 2205, Los Angeles, California 90067 ("SUBJECT PREMISES 1"), as further described in Attachment A-1, for the list of items to be seized as set forth in Attachment B-1.

b.    An application for a warrant to search the residence of Judy K. Regnier ("REGNIER") located at 4491 Rainbow Lane, Yorba Linda, California 92886 ("SUBJECT PREMISES 2"), as

further described in Attachment A-2 for the list of items to be seized as set forth in Attachment B-2.

        c.   An application for a warrant to search the business premises of The X-Law Group ("X-Law Group") located at 1910 West Sunset Boulevard, Suite 450, Los Angeles, California 90026 ("SUBJECT PREMISE 3" and, collectively with SUBJECT PREMISES 1 and SUBJECT PREMISES 2, the "SUBJECT PREMISES"), as further described in Attachment A-3 for the list of items to be seized as set forth in Attachment B-3.

        3.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. PROPERTY TO BE SEARCHED

        4.   The property to be searched are the SUBJECT PREMISES, including any individuals, containers, or digital devices found therein, as described in Attachments A-1, A-2, and A-3. Attachments A-1, A-2, and A-3 are incorporated herein by reference.

### IV. ITEMS TO BE SEIZED

        5.   The requested search warrants seek authorization to seize from the SUBJECT PREMISES any evidence, fruits, or

instrumentalities of violations of 26 U.S.C. § 7201 (attempt to evade or defeat tax); 26 U.S.C. § 7202 (willful failure to collect or pay over tax); 26 U.S.C. § 7203 (willful failure to pay tax or file return); 26 U.S.C. § 7212 (interference with administration of internal revenue laws); 18 U.S.C. § 152 (concealment of assets in bankruptcy); 18 U.S.C. § 157 (bankruptcy fraud); 18 U.S.C. § 371 (conspiracy); 18 U.S.C. § 1001 (false statements); 18 U.S.C. § 1014 (false statement to a bank or other federally insured institution); 18 U.S.C. § 1028A (aggravated identity theft); 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 1344 (bank fraud); and 18 U.S.C. § 1957 (money laundering) (collectively, the "Subject Offenses").  The list of items to be seized is set forth in Attachments B-1, B-2, and B-3.  Attachments B-1, B-2, and B-3 are incorporated by reference herein.

## V.  SUMMARY OF PROBABLE CAUSE

6.   AVENATTI was and is an attorney licensed to practice law in the State of California.  AVENATTI practiced law through Avenatti & Associates, APC ("A&A") and Eagan Avenatti LLP ("EA LLP") in Newport Beach and Los Angeles, California.  AVENATTI was the sole owner of A&A, which owned 75 percent of EA LLP.

7.   AVENATTI was also the principal owner and Chief Executive Officer ("CEO") of Global Baristas US LLC ("GBUS"), which operated Tully's Coffee ("Tully's") stores in Washington and California.  In 2013, AVENATTI's company, Global Baristas LLC ("GB LLC"), acquired TC Global Inc., which previously operated Tully's, out of bankruptcy for approximately $9.2

million.  AVENATTI's company, A&A, owned 100 percent of Doppio

Inc., which in turn owned 80 percent of GB LLC.  GB LLC wholly

owned GBUS, which handled the day-to-day business operations of

Tully's.

8.   There is probable cause to believe that AVENATTI and

others engaged in the following criminal conduct:  (a) tax

offenses relating to GBUS's failure to pay to the IRS payroll

taxes, including federal income taxes, Social Security taxes,

and Medicare taxes (collectively, "trust fund taxes") that GBUS

withheld from its employees' paychecks, and AVENATTI's

subsequent efforts to obstruct a related IRS collection action;

(b) tax offenses relating to the tax obligations of EA LLP and

A&A, including EA LLP's failure to pay to the IRS its payroll

taxes, and EA LLP's and A&A's failure to file federal corporate

or partnership tax returns and pay federal income taxes; (c) tax

offenses relating to AVENATTI's failure to file federal

individual income tax returns and pay federal income taxes

between 2011 and 2017; (d) fraud-related offenses relating to

loans AVENATTI and his companies obtained from The Peoples Bank

in Mississippi; (e) fraud and money laundering offenses relating

to a total of approximately $5 million that AVENATTI embezzled

from his legal clients (G.B., M.P., and L.T.) in 2018; and

(f) bankruptcy fraud offenses relating to AVENATTI's and EA

LLP's efforts to conceal assets and bank accounts during federal

bankruptcy proceedings involving AVENATTI and EA LLP.

9.   On March 22, 2019, in case number SA 19-241M, I

submitted an affidavit in support of an arrest warrant and

criminal complaint charging AVENATTI with one count of bank fraud, in violation of 18 U.S.C. § 1344(1), and one count of wire fraud, in violation of 18 U.S.C. § 1343. The Honorable Douglas F. McCormick, United States Magistrate Judge, authorized the arrest warrant that same day. IRS-CI anticipates executing the arrest warrant concurrently with the proposed search warrants.

10. There is probable cause to believe that evidence of the SUBJECT OFFENSES will be found at the SUBJECT PREMISES for the following reasons:

a. First, SUBJECT PREMISES 1 is AVENATTI's personal residence. Based on my training and experience and evidence obtained during the course of this investigation, I know that SUBJECT PREMISES 1 is likely to contain AVENATTI's personal and business records, as well as digital devices that are likely to contain such records.

b. Second, SUBJECT PREMISES 2 is REGNIER's personal residence. Based on my training and experience and investigation to date, as well as REGNIER's substantial involvement in the alleged criminal conduct, I believe SUBJECT PREMISES 2 is also likely to contain relevant business records and/or digital devices containing such records. For example, I understand that EA LLP's and A&A's mail is currently being forwarded to a mailbox at a Postal Annex store less than a mile from SUBJECT PREMISES 2 and since EA LLP was evicted from their offices in Newport Beach, California, between November 2018 and

January 2019, I believe REGNIER has primarily been working from
her home.

        c.    Third, SUBJECT PREMISES 3 is the business
premises of The X-Law Group ("X-Law Group"). AVENATTI has been
leasing SUBJECT PREMISES 3 and used it as additional office
space for EA LLP since the summer of 2016. Additionally, X-Law
Group was directly involved in a number of significant financial
transactions with GBUS, GB LLC, GB Autosport LLC ("GB Auto"), EA
LLP, and A&A. Moreover, in 2018, Filippo Marchino ("MARCHINO"),
the Founding Partner of X-Law Group, was directly involved in
discussions with AVENATTI's clients, M.P. and L.T., regarding
the approximately $4 million that AVENATTI embezzled from M.P.
and L.T. in March 2018.

### VI. STATEMENT OF PROBABLE CAUSE

### A. February 2019 Warrant to Search GBUS Digital Devices

    11. On February 22, 2019, in case number 8:19-MJ-103, I
submitted an affidavit in support of an application for a
warrant to search seven digital devices in the custody of IRS-CI
in Laguna Niguel, California (the "February 2019 affidavit"),
which had been produced by former GBUS employees. The Honorable
Douglas F. McCormick, United States Magistrate Judge, authorized
the warrant that same day (the "February 2019 search warrant").
The application for a search warrant in case number 8:19-MJ-103,
as well as my February 2019 affidavit in support thereof, are
attached hereto as Exhibit 1 and incorporated herein by

reference.[1]  In summary, my February 2019 affidavit stated the following:

a.    AVENATTI was and is an attorney licensed to practice law in the State of California.  AVENATTI practiced law through A&A and EA LLP in Newport Beach, California.  AVENATTI was the sole owner of A&A, which owned 75 percent of EA LLP.

b.    AVENATTI was also the principal owner and Chief Executive Officer ("CEO") of GBUS, which operated Tully's stores in Washington and California.  In 2013, AVENATTI's company, GB LLC, acquired TC Global Inc., which previously operated Tully's, out of bankruptcy for approximately $9.2 million.  AVENATTI's company, A&A, owned 100 percent of Doppio Inc., which in turn owned 80 percent of GB LLC.  GB LLC wholly owned GBUS, which handled the day-to-day business operations of Tully's.

c.    There is probable cause to believe that between at least 2011 and the present AVENATTI committed federal offenses, including the following: (a) tax offenses relating to GBUS's payroll tax obligations and AVENATTI's efforts to obstruct an IRS collection action; (b) tax offenses relating to the tax obligations of EA LLP and A&A, including the payroll tax obligations of EA LLP; (c) tax offenses relating to AVENATTI's personal tax obligations; (d) fraud-related offenses relating to

---

[1]  The search warrant and application in case number 8:19-MJ-103 were filed under seal and remain under seal to protect the integrity of the government's ongoing investigation. Because the search warrants sought in connection with this application are likely to be executed concurrently with AVENATTI's arrest warrant, the government will likely be moving to unseal this application and the February 2019 search warrant after AVENATTI's arrest.

loans AVENATTI and his companies obtained from The Peoples Bank
in Mississippi; and (e) wire fraud, money laundering, and
bankruptcy fraud offenses relating to an approximately $1.6
million settlement payment AVENATTI and EA LLP received in
January 2018, but failed to transfer to EA LLP's client or
disclose in federal bankruptcy proceedings involving AVENATTI
and EA LLP.

          d.    First, between the fourth quarter of 2015 and the
fourth quarter of 2017, inclusive, GBUS failed to file
employment tax returns and pay approximately $3,121,460 in
federal payroll taxes, including approximately $2,390,048 in
trust fund taxes, which had been withheld from GBUS employees'
paychecks.  Multiple former GBUS employees have said that
AVENATTI was responsible for all of GBUS's significant financial
and business decisions, including the decision not to pay the
payroll and trust fund taxes that GBUS owed to the IRS.  Indeed,
AVENATTI was well aware of GBUS's outstanding tax obligations,
yet repeatedly refused to authorize the required tax payments to
the IRS.

          e.    Although GBUS failed to pay to the IRS its
payroll taxes between the fourth quarter of 2015 and the fourth
quarter of 2017, AVENATTI caused substantial amounts of money to
be transferred from GBUS's or GB LLC's bank accounts during this
same time period.  For example, a preliminary analysis of GBUS's
and GB LLC's bank account records shows that between 2015 and
2017 AVENATTI caused a net of approximately $1.7 million to be
transferred from GBUS's or GB LLC's bank accounts to bank

accounts associated with A&A or EA LLP.[2]  This money could have

and should have been used to pay GBUS payroll tax obligations.

      f.    Additionally, after the IRS initiated a

collection action relating to GBUS's outstanding payroll tax

obligations in September 2016, issued an approximately

$5,000,000 tax lien against GBUS in July 2017, and levied

multiple GBUS bank accounts, AVENATTI directed repeated attempts

to evade collection of those payroll taxes and obstruct the IRS

collection action.  Among other things, AVENATTI took the

following steps to evade the collection of payroll taxes due to

the IRS and obstruct the IRS collection action:

      i.    In October 2016, when first contacted by an

IRS Revenue Officer ("RO 1") regarding GBUS's unpaid payroll

taxes, AVENATTI falsely stated that a third-party payroll

company was responsible for filing GBUS's payroll tax returns

and making GBUS's federal tax deposits.  AVENATTI, however, knew

that GBUS's third-party payroll company, Ceridian HCM Inc., had

discontinued the tax services it had previously provided to GBUS

and was, therefore, no longer responsible for filing GBUS's

payroll tax returns and making the necessary federal tax

deposits.  AVENATTI was well aware that GBUS was not paying its

payroll taxes.  GBUS employees repeatedly asked him to authorize

---

    [2]  A further analysis of GBUS's and GB LLC's bank account
records shows that between September 2015 and December 2017,
AVENATTI caused a net of approximately $2,527,318 to be
transferred from GBUS's and GB LLC's bank accounts to bank
accounts associated with A&A and EA LLP.  Moreover, in September
2015 and October 2015 alone, when GBUS first stopped paying its
payroll taxes to the IRS, AVENATTI caused a net of approximately
$501,582 to be transferred to EA LLP's and A&A's bank accounts.

the payment of GBUS's payroll taxes to the IRS, yet he refused to do so.

ii.  In September 2017, after IRS RO 1 advised GBUS of the possibility of criminal proceedings and levied multiple GBUS bank accounts, including a GBUS account at KeyBank, AVENATTI directed GBUS employees to stop depositing cash receipts from the Tully's stores into the account at KeyBank.  Instead, in order to avoid the levies, AVENATTI directed GBUS employees to deposit all cash receipts from Tully's stores into a little-used bank account at Bank of America associated with his car racing entity, GB Auto.  Between September 2017 and December 2017, GBUS employees deposited approximately $859,784 in cash into the GB Auto account at AVENATTI's direction.

iii. In late-September and early-October 2017, in order to avoid IRS levies issued to the sponsoring bank for GBUS's merchant credit card processing accounts ("merchant accounts"), AVENATTI directed GBUS's credit card processing company, TSYS Merchant Solutions ("TSYS"), to change the company name and Employer Identification Number ("EIN") associated with the merchant accounts from GBUS to GB LLC.  AVENATTI also directed TSYS to have all credit card receipts paid to a new bank account under the name of GB LLC, which AVENATTI and REGNIER had opened that same day in Orange County, California, instead of the bank accounts associated with GBUS, which were already subject to the IRS levies.

iv.  In November 2016, approximately one month after RO 1 first contacted AVENATTI, AVENATTI changed the name of the party to a contract with The Boeing Company ("Boeing") from GBUS to "GB Hospitality LLC," a company which does not appear to have ever been registered with any government agency or operated.  Later, in September 2017, after the IRS had issued levies to Boeing and a number of banks with which GBUS had accounts, Boeing cancelled the contract because GBUS had failed to make the required commission payments.  In connection with the cancellation of the contract, Boeing agreed to purchase two existing Tully's "kiosks" at Boeing facilities and other Tully's equipment in exchange for a total of $155,010 and the forgiveness of GBUS's debt to Boeing.  Although all of the Tully's locations were operated by GBUS, AVENATTI told an attorney at Boeing to use the name GB LLC on the two bills of sale for the kiosks and equipment, and instructed Boeing to wire the $155,010 payment to an attorney trust account associated with EA LLP rather than any of the bank accounts associated with GBUS.  Had the Boeing contract and subsequent bills of sale been under the name GBUS, Boeing would not have made the $155,010 payment due to the existing GBUS tax lien.  After receiving the $155,010 payment from Boeing, AVENATTI transferred the $155,010 to an A&A bank account, from which he then transferred $15,000 to his personal checking account, paid approximately $13,073 for rent at his residential apartment in Los Angeles, California (SUBJECT PREMISES 1), and paid approximately $8,459 to Neiman Marcus.  Indeed, out of the $155,010 Boeing transferred to the

EA LLP trust account, it appears that only approximately half
ever ended up in GBUS's bank accounts.

g.   Second, AVENATTI's other companies, EA LLP and
A&A, have repeatedly failed to meet their tax obligations
despite generating substantial revenues.  Between 2015 and 2017,
EA LLP failed to file payroll tax returns and pay approximately
$2.4 million in payroll taxes, including approximately
$1,279,001 in trust fund taxes that had been withheld from EA
LLP employees' paychecks.  Just as he did in connection with
GBUS, AVENATTI lied to the IRS when initially contacted
regarding EA LLP's failure to pay its payroll taxes, and falsely
claimed that a third-party payroll company, Paychex, was
responsible for making the required tax payments even though the
payroll company had notified AVENATTI in January 2015 that it
was discontinuing various payroll tax services.  Additionally,
EA LLP has not filed partnership tax returns (IRS Form 1065) for
the 2013, 2014, 2015, 2016, and 2017 tax years, even though EA
LLP appears to have received approximately $137,890,016 of
deposits into its bank accounts during these tax years.  Indeed,
AVENATTI's personal website claims that AVENATTI has recovered
over one billion dollars in verdicts and settlements for his
clients.  Similarly, A&A has not filed corporate tax returns
(IRS Form 1120S) for the 2011, 2012, 2013, 2014, 2015, 2016, or
2017 tax years, even though A&A appears to have received
approximately $37,961,633 of deposits into its bank accounts
during these tax years, including net payments of approximately
$23,820,816 from EA LLP.

       h.   <u>Third</u>, AVENATTI filed federal personal income tax returns for the 2009 and 2010 tax years indicating that he owed the IRS a total of approximately $850,438, plus interest and penalties.  AVENATTI, however, did not pay the IRS the amounts he owed for those tax years.[3]  AVENATTI then failed to file personal tax returns for the 2011 through 2017 tax years. During these tax years, AVENATTI generated substantial income and lived lavishly, yet largely failed to pay any federal income tax.  A preliminary analysis of AVENATTI's personal bank accounts reflects that AVENATTI received net payments of approximately $8,464,064 from A&A and EA LLP between 2011 to 2017.  AVENATTI also repeatedly used money that had been transferred from GBUS, GB LLC, and EA LLP to A&A to pay for personal expenses.  Further, AVENATTI received proceeds of approximately $5.4 million when he sold his home in Laguna Beach, California in 2015.  Finally, in connection with recent divorce proceedings, AVENATTI's wife said that AVENATTI told her that he earned $3.7 million dollars in 2016.  His wife also said that their family's monthly expenses were over $200,000 per month.  Financial and escrow company records show that from approximately September 2015 to September 2016, AVENATTI and his wife rented a home in Newport Beach for $100,000 per month, after making a $1,000,000 deposit.

---

   [3] The tax due and owing to the IRS for the 2009 and 2010 tax years was not paid until November 2015, when AVENATTI sold his residence in Laguna Beach, California, upon which there was an IRS tax lien.

    i.   Fourth, between approximately January 2014 and December 2014, AVENATTI obtained three separate loans from The Peoples Bank, a federally insured bank in Mississippi: (1) a $850,500 loan to GB LLC in January 2014; (2) a $2,750,000 loan to EA LLP in March 2014; and (3) a $500,000 loan to EA LLP in December 2014.  In connection with these loans, AVENATTI provided The Peoples Bank with false federal personal income tax returns for the 2011, 2012, and 2013 tax years.  In these purported tax returns, AVENATTI claimed that he earned $4,562,881 in adjusted gross income in 2011, $5,423,099 in adjusted gross income in 2012, and $4,082,803 in adjusted gross income in 2013.  He also claimed that he had paid to the IRS $1,600,000 in estimated tax payments in 2012, and $1,250,000 in estimated tax payments in 2013.  However, AVENATTI never filed personal income tax returns for the 2011, 2012, and 2013 tax years, and did not make any estimated tax payments during the 2012 and 2013 tax years.  In fact, as noted above, at the time, AVENATTI still owed the IRS approximately $850,438 in unpaid personal income taxes, plus interest and penalties, from the 2009 and 2010 tax years.  Additionally, in March 2014, AVENATTI provided The Peoples Bank with a 2012 federal tax return for EA LLP which claimed total income of $11,426,021 and ordinary business income of $5,819,456.  However, the 2012 federal tax return EA LLP actually filed with the IRS in October 2014 claimed total income of only $6,212,605 and an ordinary business loss of $2,128,849.

     j.   <u>Fifth</u>, between January 2018 and November 2018, AVENATTI defrauded one of EA LLP's client, G.B., out of the client's portion of an approximately $1.6 million settlement payment.  Specifically, in January 2018, AVENATTI arranged for the $1.6 million settlement payment to be transferred to one of his attorney trust accounts.  Rather than transfer his client's portion of the settlement proceeds to his client, AVENATTI used the entire $1.6 million for his own purposes, including to pay for expenses relating to GBUS.  He then lied to his client and claimed that the settlement payment was not due until March 2018.  When the fake March 2018 deadline passed, AVENATTI led his client to believe that the $1.6 million payment had never been received.  Additionally, AVENATTI failed to disclose in federal bankruptcy proceedings involving AVENATTI and EA LLP that he had received the $1.6 million settlement payment, despite being aware that he was required to do so.

     k.   AVENATTI has described REGNIER as his office manager, chief paralegal, and bookkeeper.  She appears to have worked for EA LLP (or its predecessor firm Eagan O'Malley & Avenatti LLP) in an administrative capacity since at least 2008.[4] At various times, REGNIER was a signatory on bank accounts associated with GBUS, GB LLC, GB Auto, EA LLP, and A&A.  REGNIER was personally involved in many of the events at issue in the government's investigation, including directing or executing the

---

    [4] Although my February 2019 affidavit said that REGNIER worked for EA LLP since at least 2010, I have since reviewed publicly available information indicating that she worked at Eagan O'Malley & Avenatti since at least 2008.

transfer of funds between various entities associated with
AVENATTI, directing the actions of GBUS employees, and
transmitting signed contracts and agreements on behalf of GBUS,
GB LLC, EA LLP, or A&A to other parties.

**B.    Additional Evidence Regarding the GBUS Tax Offenses**

12.   As noted in my February 2019 affidavit, between the
fourth quarter of 2015 and the fourth quarter of 2017, GBUS
failed to pay to the IRS approximately $3,121,460 in federal
payroll taxes, including approximately $2,390,048 in trust fund
taxes.   AVENATTI also repeatedly attempted to obstruct the IRS
collection action arising from GBUS's failure to pay its payroll
taxes.   Since I submitted my February 2019 affidavit, the
investigation has uncovered additional evidence regarding this
conduct.

13.   In my February 2019 affidavit, I noted that GBUS's
former controller, M.B., told IRS-CI that she sent AVENATTI an
email explaining the ramifications of GBUS not paying its
payroll taxes to the IRS.   (Ex. 1, ¶ 26.h.)   Based on my review
of evidence obtained from the February 2019 search warrant, I
have learned that on November 5, 2015, M.B. sent AVENATTI an
email[5] titled "Information only – Q4 2015 941 Payroll Tax."   The
email stated, in full, the following:

> Michael,
>
> Per you instruction, 941 payroll tax and unemployment
> tax payments (federal withholding, Medicare and social

---

[5]   This email was sent to mavenatti@eaganavenatti.com.
Based on the evidence collected during IRS-CI's investigation, I
know that AVENATTI almost exclusively used his EA LLP email
address mavenatti@eaganavenatti.com to conduct business on
behalf of GBUS and his other companies.

security) are not to be paid on an as-we-go basis but
will be paid in total at the 1/31/16 filing due
date.  Two implications result from this strategy:

1. Estimated total tax payment due at 1/31/16 will be
   about $575,000 - $600,000, exclusive of penalties
   and interest.

   a. 6 payrolls each with an $83,000 941 tax
      obligation for a total of $500,000
   b. Federal unemployment of about $8,200
   c. State (CA and WA) unemployment of about $28,000
   d. Washington L&I (workers comp) of about $50,000

2. Global Baristas is a semiweekly filer for 941 tax
   per the Internal Revenue Service.  Per Publication
   15 for semiweekly filers, if the pay day falls on a
   Saturday, Sunday, Monday and/or Tuesday, (Monday as
   the case of GB) then taxes are required to be
   deposited by the following Friday.  Again per
   Publication 15 "you are required to deposit 100% of
   your tax liability on or before the due
   date".  Deposit penalties are as follows:

   a. 2% - Deposit made 1-5 days late
   b. 5% - Deposit made 6-15 days late
   c. 10% - Deposit made 16 or more days late.  Also
      applies to amounts paid within 10 days of the date
      of the first notice the IRS sent asking for the tax
      due
   d. 15% - Amounts still unpaid more than 10 days after
      the date of the first notice the IRS sent asking for
      the tax due or the day on which you received notice
      and demand for immediate payment, whichever is
      earlier.

I have attached Publication 15 for your
reference.  Unemployment will also carry penalties and
interest.

Again, this is for your information, thus I am not
looking for a response or direction.  I wanted to
ensure that you were aware of the implications.

A copy of the "Employer's Tax Guide," IRS Publication 15 for

2015 was attached to the email.  M.B. forwarded a copy of this

email to M.E., GBUS's former Director of Human Resources, on or about December 18, 2015.

14.   As noted in my February 2019 affidavit, M.E. told IRS-CI that AVENATTI had instructed her not to file GBUS's quarterly payroll tax returns ("IRS Forms 941").   (Ex. 1, ¶ 30.1.)   The following hard-copy documents M.E. produced to IRS-CI corroborate M.E.'s statements:

a.   On July 29, 2016, M.E. sent AVENATTI and V.S. an email titled "Q2 Tax Filing Review."  The email included a spreadsheet detailing amounts owed to various tax agencies, including a total of approximately $1,466,554 in federal payroll taxes due to the IRS for the fourth quarter of 2015, and the first and second quarters of 2016, as well as Federal Unemployment Tax Act ("FUTA") taxes due to the IRS for the 2015 tax year.  The email also attached a letter that GBUS had received "from the IRS referring to the FUTA Unemployment Tax from 2015."[6]  M.E. sent this email to AVENATTI over two months before AVENATTI told IRS RO 1 on October 7, 2016, that he was unaware that GBUS had failed to pay its payroll taxes, and blamed the error on GBUS's third-party payroll company.  (See Ex. 1, ¶ 23(d).)

b.   On October 27, 2016, M.E. sent AVENATTI and V.S. an email titled "Q3 Tax Filing Review."  The email included an updated spreadsheet detailing GBUS's outstanding tax liabilities, including a total of approximately $1,953,850 in

---

[6] The attachment to this email was not included in the hard-copy documents that M.E. produced to IRS-CI.

federal payroll taxes due to the IRS for the fourth quarter of 2015 and the first through third quarters of 2016, as well as FUTA taxes due to the IRS for the 2015 tax year. M.E. appears to have attached to the email drafts of GBUS's IRS Form 941 for the third quarter of 2016. AVENATTI responded later that same day, "Thanks [M.E.]  Please do not file anything yet.  I am having our outside CPA look at the attached and other tax issues."

       c.  On January 30, 2017, M.E. sent AVENATTI and V.S. an email titled "Q4 Tax filing Review."  The email included an updated spreadsheet detailing GBUS's outstanding tax liabilities, including a total of approximately $2,836,269 in federal payroll taxes due to the IRS for the fourth quarter of 2015, the first through fourth quarters of 2016, and the first quarter of 2017, as well as FUTA Unemployment taxes payments due to the IRS for the 2015 and 2016 tax years.  AVENATTI responded moments later:  "We are handling.  Thanks."

    15.  As noted in my February 2019 affidavit, GBUS's former Director of Retail Operations, M.G., told IRS-CI that in September 2017 AVENATTI had directed M.G. to deposit cash from the Tully's stores at a Bank of America account associated with GB Auto ("GB Auto BofA Account 7412").  (Ex. 1, ¶¶ 31.i-31.k.) Based on my review of evidence obtained from the February 2019 search warrant, I have learned the following additional information demonstrating that AVENATTI and REGNIER were already aware of the IRS levy notices when AVENATTI directed the Tully's

stores to deposit all cash into GB Auto BofA Account 7412.  For example:

    a.   On or about August 25, 2017, V.S. emailed a KeyBank representative and said:  "There is a hold(s) on the account #4**93 for Global Baristas Us, LLC; can you send me a copy of what order/lien this may be for, thanks."  In response, the KeyBank representative told V.S. that KeyBank had two levies on the GBUS account, including one levy from the IRS.  On August 28, 2017, another KeyBank representative sent a further response to V.S. advising V.S. that KeyBank was "required to sweep the available funds from the account and send them to the parties in the order" and that KeyBank "will probably be served randomly until the judgments are satisfied."  V.S. then forwarded this email string to AVENATTI, who responded moments later stating "Please send me the email you sent him before his response."

    16.  As noted in my February 2019 affidavit, M.G. also said that she would send AVENATTI text messages attaching pictures of the deposit slips after each cash deposit.  (Ex. 1, ¶¶ 31.i-31.k.)  Text messages M.G. produced to IRS-CI confirm that AVENATTI instructed M.G. to make these cash deposits and that M.G. sent him pictures of the deposit slips after most of the cash deposits.  For example:

    a.   On September 7, 2017, AVENATTI sent a text message to M.G. with the account information for GB Auto BofA Account 7412.  Later that day, M.G. sent AVENATTI a text message stating:  "On my way to the bank.  If they ask is the business address and phone number for GB Autosport the Western Avenue

address [i.e., GBUS's address]?"  AVENATTI responded via text
message, "Yes."  M.G. then sent AVENATTI a text message
attaching a deposit slip indicating that approximately $81,524
had been deposited into GB Auto BofA Account 7412.  AVENATTI
responded, "Thanks."

     b.  On September 18, 2017, M.G. sent a text message
to AVENATTI asking:  "Are stores able to deposit at Key Bank
[sic] yet?"  Moments later, AVENATTI responded via text message
stating:  "Not yet but hopefully in next two days.  Can you
collect deposits tmrw and deposit pls?"

     c.  On September 28, 2017, AVENATTI sent a text
message to M.G. and V.S. asking:  "When are we depositing
again?"  V.S. responded "Friday afternoon."  Moments later,
AVENATTI sent another text message asking: "When was the last
deposit and what did it include?"  After V.S. responded,
AVENATTI sent another text message stating: "It is important
that these deposits be made regularly.  Thanks."

     d.  Between September 7, 2017, and December 1, 2017,
M.G. sent AVENATTI or AVENATTI and V.S. text messages with
pictures of deposit slips reflecting deposits into GB Auto BofA
Account 7412 on 24 separate occasions.  On multiple occasions,
AVENATTI responded to these text messages by stating, "Thanks."
Based on my review of bank account information, I know that the
information on the deposit slips directly corresponds to
deposits that were actually made into GB Auto BofA Account 7412.

    17.  In my February 2019 affidavit, I indicated that on or
about September 29, 2017, AVENATTI instructed a TSYS

representative (TSYS Rep. 1") to change the name and EIN associated with GBUS's merchant accounts from "Global Baristas US LLC" to "Global Baristas, LLC." (Ex. 1 ¶ 37.d.)  During this conversation, AVENATTI suggested that he did not know why TSYS was holding GBUS's funds.  Based on my review of evidence obtained from the search warrant authorized in February 2019, I have learned the following additional information demonstrating that AVENATTI and REGNIER were already aware of the IRS levy notices at that time:

a.   On September 12, 2017, REGNIER sent an email to V.S. titled "CBT Levy."  In this email, REGNIER listed the amounts of various levies on the CB&T accounts since June 1, 2017, and asked V.S. to provide information regarding levies on KeyBank and BofA.  In response, V.S. said, among other things, that "IRS also hit tsys account 8-25-17, still confirming."

b.   On or about September 28, 2017, V.S. sent an email to AVENATTI titled "IRS Levies 9/20 and 9/25 and 9/27." The email included, among other things, the following information:  "9.25.17 tsys - $22,135.19 IRS levy."

c.   On or about September 29, 2017, at approximately 10:57 a.m., V.S. sent an email to AVENATTI titled "Levies," in which he stated that "IRS took as [sic] additional $23,73.02 from tsys yesterday."  Based on the timing of other emails between AVENATTI and TSYS Rep. 1 on September 29, 2017, it appears that AVENATTI received this email from V.S. before he first called TSYS Rep. 1 on September 29, 2017.

C.   **Additional Evidence Relating to AVENATTI's Scheme to Defraud His Legal Client, G.B.**

18.   As set forth in my February 2019 affidavit, AVENATTI engaged in a scheme to defraud his client, G.B., out of G.B.'s portion of an approximately $1.6 million settlement payment AVENATTI and EA LLP that received in January 2018 in connection with an arbitration proceeding against a Colorado-based company ("Company 1").   (See Ex. 1, § IV.G.)   Specifically, in January 2018, AVENATTI arranged for the $1.6 million settlement payment to be transferred to a City National Bank attorney trust account[7] ending in 5566 ("CNB Trust Account 5566").   (See id.)   AVENATTI then used the entire $1.6 million for his own purposes, including to pay for expenses relating to GBUS.[8]   (See id.) AVENATTI then lied to his client and claimed that the settlement payment was not due until March 2018.   (See id.)   When the March 2018 deadline passed, AVENATTI led his client to believe that the $1.6 million payment had never been received.   (See id.)

19.   On March 15, 2019, I participated in an interview of G.B.   The information G.B. provided during the interview was consistent with the information G.B. and his counsel had

---

[7]   I understand that the State Bar of California has specific rules that apply to the proper use of attorney trust accounts.   For example, I understand that Rule 1.15 of the State Bar of California states that "[f]unds belonging to the lawyer or the law firm shall not be deposited or otherwise commingled with funds held in a trust account."

[8]   AVENATTI and REGNIER were the only two signatories for CNB Trust Account 5566.   Moreover, based on a further review of the bank records for CNB Trust Account 5566, I have learned that REGNIER authorized at least eight of the payments from CNB Trust Account 5566.

previously provided to IRS-CI and the Newport Beach Police
Department ("NBPD").  During the interview, G.B.[9] also provided
the following additional information:

a.   On or about December 28, 2017, G.B. met with
AVENATTI at EA LLP's offices in Newport Beach, California, to go
over the proposed settlement agreement with Company 1.  During
this meeting, AVENATTI provided G.B. with a copy of the $1.9
million settlement agreement to review.  The settlement
agreement AVENATTI provided to G.B. listed the payment dates as
$1.6 million on March 10, 2018, and $100,000 on March 10 of each
of the next three years.  As noted in my February 2019
affidavit, this information was false and the actual settlement
agreement required Company 1 to pay G.B. $1.6 million on January
10, 2018, and $100,000 on January 10 of each of the three
subsequent years.  (Ex. 1, ¶ 75.e.)

b.   Based on my review of documents produced by
G.B.'s counsel, I know that on or about June 29, 2018, G.B. sent
an email to REGNIER asking her to forward to G.B. the signed
settlement agreement with Company 1.  During his interview, G.B.
said that sometime after he sent this email REGNIER brought him
a physical copy of the fully-executed settlement agreement while
G.B. was at EA LLP's offices.  REGNIER handed AVENATTI the
settlement agreement.  AVENATTI flipped through the settlement

---

[9]  G.B. previously pleaded guilty to a felony theft count in
approximately September 2018 and was sentenced to probation.
(See Ex. 1, ¶ 75 n.44.)  During his interview, G.B. said that
AVENATTI had encouraged him to plead guilty and that AVENATTI
continued working with G.B. and one of G.B.'s companies after
G.B.'s guilty plea.

agreement and then handed it to G.B. This copy of the
settlement agreement also falsely stated that the settlement
payments were due on March 10 of 2018 through 2021, as opposed
to January 10 of 2018 through 2021.

c. As noted in my February 2019 affidavit, between
April 2018 and November 2018, AVENATTI "advanced" G.B.
approximately $130,000 to help G.B. meet certain financial
obligations while he waited for his portion of the $1.6 million
settlement payment from Company 1. During his interview, G.B.
said that in approximately October 2018, AVENATTI told G.B. that
AVENATTI would be able to loan G.B. another $100,000 sometime
during the first two weeks of January 2019. Notably, under the
terms of the true settlement agreement, Company 1 was scheduled
to make an additional $100,000 settlement payment to AVENATTI's
trust account on January 10, 2019. Thus, it appears that
AVENATTI was offering to loan G.B.'s own money to G.B.

20. During the interview on March 15, 2019, G.B's current
counsel also confirmed that AVENATTI still has not turned over
G.B.'s client file to his current attorneys despite repeated
requests that he do so.

**D.** **Additional Evidence Relating to AVENATTI's Scheme to**
**Defraud His Legal Clients, M.P. and L.T.**

21. As set forth in my February 2019 affidavit, it appears
that in or around March 2018 AVENATTI embezzled approximately $4
million from his client's M.P. and L.T. (Ex. 1, ¶ 50.h n.31.)
Based on a further review of information I received from NBPD,
including recorded interviews of M.P. and L.T. and documents

M.P. and L.T. provided to Newport Beach Police Department ("NBPD") and IRS-CI, I have learned the following information regarding AVENATTI's scheme to defraud M.P. and L.T.:

  a. In or around August 2017, M.P. and her business manager, L.T., hired AVENATTI to assist them in separating from one of the companies that M.P. owned ("MP Company 1").

  b. On or about August 15, 2017, M.P. and L.T. entered into an "Attorney-Client Fee Contract (Contingency)" with AVENATTI and EA LLP.[10]  Under the terms of the agreement, AVENATTI would receive 7.5 percent of the "recovery" or transaction amount.  In other words, AVENATTI would receive 7.5 percent of the total amount M.P. would receive when she sold her shares in MP Company 1 back to MP Company 1.  To the extent the transaction resulted in multiple payments to M.P., AVENATTI was to receive his entire 7.5 percent fee from the initial lump-sum payment.  The agreement also authorized AVENATTI to retain MARCHINO, the founding partner of X-Law Group, to serve as outside or local counsel in connection with the representation.

  c. On or about September 17, 2017, MP Company 1 entered into a "Common Stock Repurchase Agreement" with M.P.  In sum, under the terms of the Common Stock Repurchase Agreement, MP Company 1 agreed to repurchase 361,565 shares of MP Company 1 from M.P. for approximately $27,478,940, and to subsequently repurchase from M.P. an additional 107,188 shares of MP Company 1 for approximately $8,146,288.  Thus, M.P. was to receive a

---

[10] The Attorney-Client Fee Contract identifies "Michael Avenatti, Esq." as the attorney, but is signed by AVENATTI on behalf of EA LLP.

total of approximately $35,625,228 under the terms of the Common
Stock Repurchase Agreement.   AVENATTI's fee of 7.5 percent would
amount to approximately $2,671,892 out of the $35,625,228.

      d.   On or about September 18, 2017, MP Company 1
wired approximately $27,414,668 to AVENATTI's trust account at
City National Bank ending in 4705 ("Avenatti CNB Trust Account
4705").[11]  After receiving the $27,414,668 wire on September 18,
2017, AVENATTI caused approximately $2,787,650 (which
constituted AVENATTI's attorney fees for the entire $35,625,228
transaction amount) to be transferred to a separate bank account
at City National Bank under the name "Michael Avenatti, Esq."
("Avenatti CNB Account 3504").[12]  Between September 21, 2017, and
October 3, 2017, AVENATTI then caused the remaining $24,747,466
MP Company 1 had transferred to Avenatti CNB Trust Account 4705
to be transferred to M.P.'s personal bank account and the bank
account for another company M.P. controlled ("MP Company 2").

      e.   On or about March 8, 2018, MP Company 1's Chief
Financial Officer ("CFO") contacted M.P. and told her that MP
Company 1 was prepared to repurchase the remaining 107,188
shares of MP Company 1 and would be making the final payment of
approximately $8,146,288.  The CFO asked M.P. to confirm that
the funds should again be wired to Avenatti CNB Trust Account
4705.  M.P. then forwarded this email to L.T.  M.P. and/or L.T.
then spoke with AVENATTI.  AVENATTI agreed that MP Company 1

---

[11] AVENATTI and REGNIER were the only two signatories on
Avenatti CNB Trust Account 4705.

[12] AVENATTI and REGNIER were the only two signatories on
Avenatti CNB Account 3504.

could wire the final payment to Avenatti CNB Trust Account 4705
and that he would then wire the money to M.P. and L.T.

     f.   On or about March 13, 2018, M.P. emailed MP
Company 1's CFO and confirmed that the wire information for
Avenatti CNB Trust Account 4705 was correct.

     g.   On or about March 14, 2018, MP Company 1 wired
approximately $8,146,288 to Avenatti CNB Trust Account 4705 to
be held in trust for M.P.

     h.   AVENATTI did not immediately transfer the
$8,146,288 funds to M.P. as he had promised to do and as he was
required to do under the Attorney-Client Fee Contract.  Rather,
based on my review of bank account records, I know that AVENATTI
used substantial portions of the $8,146,288 for his own personal
purposes.  For instance:

     i.   On March 15, 2018, AVENATTI caused
approximately $3,000,000 to be transferred to an EA LLP CB&T
attorney trust account ending in 4613 ("EA CB&T Trust Account
4613").[13]  AVENATTI then caused approximately $2,828,423 to be
transferred from EA CB&T Trust Account 4613 to an attorney trust
account for SulmeyerKupetz, which was the law firm representing
A&A and AVENATTI in the 2017 EA LLP bankruptcy proceedings, In
re: Eagan Avenatti, LLP, No. 8:17-BK-11961-CB (C.D. Cal.) (the
"2017 EA Bankruptcy"), later that same day.  As noted in my
February 2019 affidavit, on March 26, 2018, these funds were
then used to repay creditors in the 2017 EA Bankruptcy,

---

[13] AVENATTI and REGNIER were the only two signatories on EA
CB&T Trust Account 4613.

including an approximately $1,508,442 payment to the IRS.  (Ex. 1, ¶ 50.h.)

         ii.   Between March 20, 2018, and May 1, 2018, AVENATTI caused a total of approximately $786,138 of M.P.'s funds to be transferred to EA CB&T Trust Account 4613 and a total of approximately $260,000 to be paid to an EA LLP CB&T debtor in possession account ending in 0313 ("EA CB&T DIP Account 0313.  Once M.P.'s funds had been transferred to EA CB&T Trust Account 4613, AVENATTI used M.P.'s funds for a variety of other improper and unauthorized purposes, including: (a) transferring a total of over $300,000 to bank accounts associated with GBUS and GB LLC; (b) transferring a total of over $275,000 to bank accounts associated with A&A; and (c) transferring a total of approximately $12,000 to his girlfriend at the time, M.M.

         i.   After AVENATTI received the $8,146,288 payment from MP Company 1 on March 14, 2018, L.T. and M.P. repeatedly asked AVENATTI when M.P. could expect to receive the funds. AVENATTI would often not respond to the L.T.'s calls or text messages.  When AVENATTI did respond, he falsely represented to M.P. and L.T. that he would transfer the money to them at a later time and failed to disclose that he had already spent a substantial portion of M.P.'s funds for his own personal purposes.  For instance:

         i.   On or about March 23, 2018, L.T. sent AVENATTI a text message stating: "Hi Michael, checking in on the

wire.  Let me know when we should expect it to come our way.
Thanks!"

ii.  On or about April 5, 2018, L.T. sent
AVENATTI a text message stating "Good morning Michael!  Just
wanted to follow-up on the wire and plane[14] availability.
Thanks!"  AVENATTI responded that same day stating "In NYC –
back tmrw and then we should be able to clear wire."

iii. On or about April 23, 2018, L.T. sent
AVENATTI a text message stating: "Good morning Michael.  Please
confirm after the wire is sent today.  Thanks."  Later that day,
L.T. sent another text message later that day stating:  "Can
your office provide Fed Ref number for [M.P.'s] wire?  It is
neither posted nor pending status on our end."  AVENATTI then
responded "I will have [REGNIER] get it."

iv.  On or about April 24, 2018, L.T. sent
AVENATTI a text message stating:  "Just following up on the Fed
Ref #.  We haven't been able to track down [M.P.'s] wire yet."
AVENATTI responded that "I've asked [REGNIER] to get you what u
need."

v.  On or about April 24, 2018, M.P. met
AVENATTI for lunch.  M.P. asked AVENATTI if everything was okay
with the money.  AVENATTI responded that everything was okay and
that he just needed to go to the bank once he got back to
Newport Beach and sign the paperwork.

---

14  As set forth in my February 2019 affidavit, AVENATTI had
at least one private jet at this time.  (Ex. 1, ¶ 65.m.)

vi.   On or about April 25, 2018, L.T. sent an email to REGNIER and AVENATTI stating:  "Hi Judy [REGNIER], Can you please provide me with the Fed Ref # for [M.P.'s] wire from Monday?"  AVENATTI responded less than an hour later "Pls handle."

vii. On or about April 26, 2018, L.T. sent another email to AVENATTI and REGNIER stating:

> We've been in contact with the bank all week and they have not been able to track the wire. Please provide the Fed Ref # with immediacy.  This is becoming very urgent.  There is $8M of [M.P.'s] money in the ether somewhere, and we have been given the runaround for over 6 weeks.  I'm becoming extremely concerned. Please advise asap.

viii.     On or about April 30, 2018, AVENATTI sent a text message to L.T. stating "I am dealing with getting a summons issued from the SDNY and will call you shortly.  Sorry for delay."  That same day, AVENATTI sent an email to REGNIER and L.T. stating:

> Judy [REGNIER] -- I know you are trying to dig out from last week, but please get with [L.T.] and figure out what the issue is on the CNB wire. This needs to be a priority. If I need to do something or find a branch on the East coast let me know but I want this resolved. Thanks.

ix.  On or about May 1, 2018, L.T. responded to AVENATTI's April 30, 2018, email stating:

> Hi Judy [REGNIER], The wire hasn't come through, and we can only trace it via the Fed Ref #. Please provide ASAP so we can see where it got held up.  This is very urgent.  Thank you.

REGNIER responded "I asked the bank to put a trace on it.  As soon as I get the results I will let you know ASAP."

   j. Between March 14, 2018, and May 4, 2018, L.T.
also repeatedly attempted to obtain information from AVENATTI's
associate, MARCHINO, regarding the $8,146,288 payment from MP
Company 1.  For instance:

    i. On or about March 14, 2018, MARCHINO sent a
text message to L.T. stating: "Hi - let me know when the wires
have been sent by [MP Company 1].  That way we can turn around
quickly."  L.T. responded that the wire had just been sent and
that he would provide MARCHINO the wire information.

    ii. On or about March 20, 2018, L.T. sent a text
message to MARCHINO to ask if AVENATTI received the wire.
MARCHINO responded:  "Hi. No idea.  Need to ask Michael
[AVENATTI].  He's knee deep in the stormy."

    iii. On or about April 22, 2019, L.T. sent a text
message to MARCHINO stating:  "Please call me back."  MARCHINO
then asked if it was urgent.  L.T. responded:  "Same
conversation as last time, so yes I'm concerned and losing
patience."

    iv. On or about May 3, 2018, L.T. sent a text
message to MARCHINO stating:  "Please call me back ASAP."
MARCHINO responded:  "I put a call in.  Will have news shortly.
Hang tight until tomorrow and I'll get this sorted for you."
MARCHINO then sent L.T. another text message stating:  "I've got
you.  Don't worry."

   k. On or about May 4, 2018, AVENATTI caused two wire
transfers in the amounts of $4,000,000 and $146,288 to be sent
from Avenatti CNB Trust Account 4705 to one of M.P.'s companies

("MP Company 3").  This amounted to just over half of the $8,146,288 that was supposed to have been transferred to M.P on or about March 14, 2018.  Yet, after making these two wire transfers, there was only $23 remaining in Avenatti CNB Trust Account 4705.

l.   After M.P. received the two wire transfers totaling approximately $4,146,288 on or about May 4, 2018, L.T. repeatedly contacted AVENATTI and MARCHINO in an attempt to find out what happened to the other $4,000,000 of M.P.'s money.  L.T. was largely unable to get a hold of AVENATTI.  MARCHINO, however, repeatedly suggested that the third wire of $4,000,000 had already been sent.  For instance:

i.   On or about May 4, 2018, MARCHINO sent a text message to L.T. asking "Did the other 4 arrive?"  L.T. responded that he would have to check on Monday.

ii.  On or about May 7, 2018, MARCHINO sent L.T. a text message asking if there were any updates.  L.T. responded: "No sign of it.  Do you have the Fed Ref # for tracking?"  L.T. received no further response that day.

iii. On or about May 9, 2018, MARCHINO sent a text message to L.T. stating:  "I just got text from bank.  We should have fed number shortly."

iv.  On or about May 10, 2018, MARCHINO sent a text message to L.T. and provided him with an IMAD wire transfer reference number that purportedly corresponded to the final $4,000,000 payment.

     v.   On or about May 11, 2018, AVENATTI emailed MARCHINO a wire transfer confirmation document detailing the $4,000,000 wire transfer from Avenatti CNB Trust Account 4705 that M.P. had already received on May 4, 2018. MARCHINO then forwarded this email to L.T. That same day MARCHINO and L.T. exchanged numerous text messages regarding the missing $4,000,000 payment. In these text messages, L.T. told MARCHINO that he needed the reference numbers for all three purported wire transfers. MARCHINO indicated that he had texted AVENATTI about this but had not heard back.

     vi.  On or about May 24, 2018, L.T. sent a text message to AVENATTI asking him to "Please call me when you have a chance." AVENATTI does not appear to have responded to this text message.

     vii. On or about June 4, 2018, L.T. sent a text message to AVENATTI stating: "Hi Michael, I really need to talk to you. Please call me back so we can figure things out." AVENATTI does not appear to have responded to this text message.

     m.   On or about August 6, 2018, current counsel for M.P. and L.T. sent a letter to AVENATTI advising him that they now represented M.P. and L.T. and demanded that AVENATTI immediately disburse to M.P. the remaining $4,000,000 that was owed to M.P. AVENATTI did not respond. AVENATTI still has not paid over to M.P. the remaining $4,000,000 he received from MP Company 1 on her behalf. Nor has AVENATTI turned over M.P. and L.T.'s client file to their current attorneys as they have repeatedly asked him to do.

22.   Additionally, as set forth in my February 2019 affidavit, in connection with the EA Bankruptcy, EA LLP and AVENATTI were required to close pre-petition bank accounts and open new "debtor in possession" bank accounts.   (Ex. 1, ¶ 51.) EA LLP and AVENATTI were also required to file with the Bankruptcy Court a monthly operating report ("MOR") detailing all funds received and disbursed by EA LLP.   (Id.)   AVENATTI, however, failed to disclose the existence of Avenatti CNB Trust Account 4705 or the funds he received from the Phan and Tran representation to the Bankruptcy Court or his creditors.

E.   **Criminal Complaint and Arrest Warrant**

23.   On March 22, 2019, in case number SA 19-241M, I submitted an affidavit in support of an arrest warrant and criminal complaint charging AVENATTI with one count of bank fraud, in violation of 18 U.S.C. § 1344(1), and one count of wire fraud, in violation of 18 U.S.C. § 1343.   The Honorable Douglas F. McCormick, United States Magistrate Judge, authorized the arrest warrant that same day.   A true and correct copy of the arrest warrant and criminal complaint are attached hereto as Exhibit 2 and incorporated by reference herein.[15]

F.   **Probable Cause to Search AVENATTI's Residence (SUBJECT PREMISES 1)**

24.   Based on the evidence collected during the course of this investigation, there is probable cause to believe that

---

[15]   A copy of the application for the February 2019 search warrant, including my February 2019 affidavit, were also incorporated by reference and attached to the criminal complaint in case number SA 19-241M.   Accordingly, I have not included a duplicate copy of the February 2019 search warrant application, as part of Exhibit 2 to this affidavit.

evidence of the SUBJECT OFFENSES will be found at SUBJECT
PREMISES 1.  For example:

        a.    On or about November 14, 2018, AVENATTI was
arrested by the Los Angeles Police Department ("LAPD") on
suspicion of domestic violence.[16]  Based on my review of the LAPD
police report, I have learned that as of November 14, 2018,
AVENATTI resided in Unit 2205 at the Ten Thousand luxury
condominium complex ("Ten Thousand") located at 10000 Santa
Monica Boulevard in Los Angeles, California (i.e., SUBJECT
PREMISES 1.)

        b.    Based on my review of bank records, I know that
A&A has been paying monthly rent to Ten Thousand since at least
March 2017.  Specifically, between March 2017 and August 2018,
approximately $227,736 (between $12,800 and $16,320 per month)
was paid to Ten Thousand from A&A CB&T Account 0661.
Additionally, on or about November 30, 2018, approximately
$69,119 was paid via cashier's check to Ten Thousand from an
account at City National Bank under the name "Avenatti LLP"
("Avenatti LLP CNB Account 1844").  Avenatti LLP CNB Account
1844 had been opened that very same day and the cashier's check
had been obtained by REGNIER.

        c.    On March 7, 2019, in case number 8:19-MJ-151, the
Honorable Douglas F. McCormick authorized a warrant for
historical cell-site and prospective cell-site and GPS
information relating to cellular telephones used by AVENATTI and

--------

[16]  AVENATTI was never formally charged with any crime in
connection with this arrest.

REGNIER.  Although I served the cell-site warrant on Verizon on March 7, 2019, I did not start receiving returns on the warrant until March 18, 2019.  Based on IRS-CI's review of this data, I have learned the following:

      i.   On or about March 21, 2019, AVENATTI returned to the Los Angeles area after travelling to another state.  AVENATTI was in the vicinity of SUBJECT PREMISES 1 that night.[17]

      ii.  On or about March 22, 2019, AVENATTI was in the vicinity of SUBJECT PREMISES 1 in the early morning hours as well during the night.

      iii. On or about March 23, 2019, AVENATTI was in the vicinity of SUBJECT PREMISES 1 early in the morning.

      d.   Based on my discussions with a United States Postal Inspector ("USPI"), I know that as recently as March 6, 2019, AVENATTI was receiving mail at 10000 Santa Monica Boulevard, Unit 2205 in Los Angeles, California (i.e., SUBJECT PREMISES 1.)

      e.   As noted in section VII below, based on my training and experience, I know that people who engage in fraud schemes and commit tax offenses frequently maintain hard copy and electronic records at their residences.  Additionally, I know that lawyers often use portable laptop computers and cellular telephones to conduct business remotely from their

---

[17]  The cell-site and GPS information IRS-CI obtained was only accurate to within approximately 900 meters of AVENATTI's cell phone.

residences and/or while traveling.  Thus, lawyers typically keep such digital devices on their person or at their residences.

f.   Here, I have reviewed numerous text messages sent by AVENATTI to GBUS employees.  I have also reviewed a number of emails AVENATTI appears to have sent after normal business hours, further suggesting that he uses his laptop and cellular telephone to conduct business.

g.   On or about March 15, 2019, I participated in an interview with G.B.  During the interview, G.B. said that he frequently saw AVENATTI using a laptop computer.

h.   I have also reviewed a profile of AVENATTI published by the New York Times Magazine on or about July 10, 2018.  This article explicitly noted that AVENATTI was using a laptop computer and an iPhone while he was being interviewed at a hotel in New York in May 2018.  See "The Fast and Furious Michael Avenatti," New York Times Magazine, July 10, 2018, available at https://www.nytimes.com/2018/07/10/magazine/michael-avenatti-stormy-daniels-donald-trump-media.html.

## G.   Probable Cause to Search REGNIER's Residence (SUBJECT PREMISES 2)

25.  As noted in my February 2019 affidavit, AVENATTI has previously described REGNIER as his office manager, chief paralegal, and bookkeeper.  (Ex. 1, ¶ 20.i.)  REGNIER was personally involved in many of the events described in my February 2019 affidavit and herein, including directing or executing the transfer of funds between various entities

associated with AVENATTI, directing the actions of GBUS
employees, receiving and executing directives from AVENATTI, and
transmitting signed contracts and agreements on behalf of
AVENATTI, GBUS, GB LLC, EA LLP, or A&A to other parties.

26.   Based on my review of publicly available information
and law enforcement databases, I know that REGNIER resides at
4491 Rainbow Lane, Yorba Linda, California (i.e., SUBJECT
PREMISES 2.)

27.   Based on the evidence collected during the course of
this investigation, there is probable cause to believe that
evidence of the SUBJECT OFFENSES will be found at REGNIER's
residence (i.e., SUBJECT PREMISES 2).  For example:

a.   Based on my discussions with a USPI, I understand
that since approximately December 6, 2018, EA LLP's United
States mail has been forwarded from EA LLP's prior offices in
Newport Beach to Private Mailbox number 404 ("PMB 404") at 18032
Lemon Drive, Suite C.[18]  18032 Lemon Drive, Suite C is the
address of a Postal Annex store located less than one mile from
REGNIER's residence (SUBJECT PREMISES 2).  The USPI also
provided me with a copy of the "Application for Delivery of Mail
Through Agent" for PMB 404 dated on or about December 3, 2018.
The application is signed by REGNIER on behalf of EA LLP, and
indicates the PMB 404 will be used to receive mail for REGNIER,
"Avenatti LLP," EA LLP, and A&A.  The application also lists

---

[18]   I also understand that EA LLP's United States mail was
being forwarded to X-Law Group's office in Los Angeles (i.e.,
SUBJECT PREMISES 3) for a short period of time after EA LLP was
evicted from its offices in Newport Beach, California.

AVENATTI as the corporation's officer.  Due to the proximity of
PMB 404 to REGNIER's residence, I believe there is a strong
likelihood that REGNIER is collecting or storing EA LLP and A&A
mail, as well as other relevant records at her residence.

   b.   Based on my review of text messages produced by
M.G. and S.F., I know that REGNIER communicated with GBUS
employees using a cellular telephone.

   c.   Based on my review of toll records for AVENATTI's
and REGNIER's cell phones, I have learned the following:

      i.   Between January 1, 2019 and March 6, 2019,[19]
there were over 100 calls between AVENATTI's cell phone number
and REGNIER's cell phone number.  Often times, there would be
multiple calls between AVENATTI's cell phone and REGNIER's cell
phone each day.

      ii.  This information strongly suggests that
REGNIER still works for AVENATTI and that REGNIER and AVENATTI
do not work at the same location since EA LLP was evicted from
its law offices in Newport Beach, California, between November
2018 and January 2019.

   d.   On or about March 15, 2019, I participated in an
interview with G.B.  During the interview, G.B. said that in
December 2018 EA LLP's receptionist, H.W., told him via an
instant message that all of EA LLP's staff members were working
from home because EA LLP had been evicted from its offices.

---

   [19]  The toll records for AVENATTI's and REGNIER's cell
phones that IRS-CI obtained from Verizon Wireless do not go past
March 6, 2019.

e.   Based on IRS-CI's review of the data obtained from the prospective cell-site and GPS information relating to a cellular telephone used by REGNIER, I have learned that from March 18, 2019 until March 22, 2019, REGNIER was in the vicinity of SUBJECT PREMISES 2 and PMB 404 during daytime and/or business hours, likely demonstrating that REGNIER has been working from home since EA LLP was evicted from its offices.

f.   On March 22, 2019, IRS-CI SA James Kim attended a judgment debtor examination of AVENATTI in the In re: Eagan Avenatti, LLP, No. 8:18-CV-10644-VAP-KES, matter in Courtroom 8A of the United States Courthouse in Los Angeles.  I learned from SA Kim that AVENATTI testified under oath that he believed EA LLP's QuickBooks records were likely with REGNIER.

g.   On June 12, 2017, in connection with the 2017 EA Bankruptcy, AVENATTI testified under oath during a creditors meeting required under 11 U.S.C. § 341 ("341 meeting").  During this proceeding, AVENATTI testified that REGNIER was his "in-house bookkeeper" and she used "QuickBooks and Excel" for financial reporting.

h.   Based on my training and experience, and investigation to date, I believe that REGNIER is working from home at SUBJECT PREMISES 2 and likely will maintain financial records of EA LLP and related entities at her home, as well as digital devices at SUBJECT PREMISES 2, all of which will likely contain evidence of the SUBJECT OFFENSES.

i.   Additionally, as noted above and in section VII below, based on my training and experience I know that people

engaged in fraud schemes frequently maintain hard copy and
electronic business records at their residences.  I also know
that lawyers and those who work for law firms often use portable
laptop computers and cellular telephones to conduct business and
typically keep such digital devices on their person or at their
residence.

**H.   Probable Cause to Search the Business Premises of X-Law
Group (SUBJECT PREMISES 3)**

28.  Based on my review of publicly available information,
including X-Law Group's website (www.thexlawgroup.com), I know
X-Law Group is a law firm operating in Los Angeles, California.
MARCHINO is X-Law Group's founding partner.  X-Law Group's
business premises are located at 1910 Sunset Boulevard, Suite
450, in Los Angeles, California (i.e., SUBJECT PREMISES 3).

29.  There are at least three reasons to believe that
evidence of the SUBJECT OFFENSES will be found at the business
premises of X-Law Group (SUBJECT PREMISES 3):  (1) Since at
least the summer of 2016, AVENATTI and EA LLP have been using X-
Law Group's offices to conduct business; (2) X-Law Group has
been involved in significant and suspicious financial
transaction involving GBUS, GB LLC, EA LLP, A&A, and AVENATTI;
and (3) X-Law Group's founding partner, MARCHINO, was directly
involved in the representation of M.P. and L.T., and subsequent
communications regarding the $4 million AVENATTI embezzled from
M.P. in March 2018.

    1.   <u>AVENATTI's and EA LLP's Use of SUBJECT PREMISES 3
to Conduct Business</u>

30.  IRS-CI's investigation has revealed the following
facts establishing that AVENATTI has been using SUBJECT PREMISES
3 to conduct business and practice law since at least August
2016, and that SUBJECT PREMISES 3 is EA LLP's and A&A's current
business premises:

    a.  During AVENATTI's June 12, 2017, 341 meeting,
AVENATTI said the following:

        i.  In the summer of 2016, EA LLP entered into a
written agreement with X-Law Group.  Under the terms of this
agreement, X-Law Group would contribute various cases and assets
to EA LLP; EA LLP would get a percentage of the fees from those
cases; and X-Law Group would get a percentage of fees from
pending cases held by EA LLP.

        ii.  Some of the attorneys from X-Law Group also
worked for EA LLP.

    b.  On July 14, 2017, AVENATTI testified under oath
during the continued 341 meeting in connection with the 2017 EA
Bankruptcy.  During this proceeding, AVENATTI said the
following:

        i.  Since the summer of 2016, there was an
agreement in place between EA LLP and X-Law Group relating to
various EA LLP cases and X-Law Group's right to fees from those
cases.

ii.   As part of this agreement, AVENATTI agreed that EA LLP would pay a portion of the salaries for certain X-Law Group attorneys.

iii. AVENATTI and/or EA LLP agreed to pay the rent for X-Law Group's office in Los Angeles

iv.   AVENATTI has known MARCHINO for approximately five years, and considers him a friend.

v.   MARCHINO and other X-Law Group lawyers were previously employed by EA LLP.

c.   Based on a preliminary review of bank records, I know the following:

i.   Between approximately September 2016 and July 2018, A&A and EA LLP paid to the International Church of the Foursquare a total of approximately $110,352.  Public records reflect that the International Church of the Foursquare owns SUBJECT PREMISES 3.

ii.   Between approximately March 2017 and June 2017, EA LLP paid MARCHINO a total of approximately $34,892.

d.   W-2 information EA LLP submitted to the IRS reflects that MARCHINO received approximately $83,333 in gross wages from EA LLP in 2016, and approximately $91,666 in gross wages from EA LLP in 2017.

e.   On or about January 24, 2018, AVENATTI filed a Substitution of Attorney form in the Superior Court of California, San Diego County in Carthey v. Pirch et al., No. 37-201823387.  The Substitution of Attorney form listed A&A's

44

mailing address as 1910 West Sunset Boulevard, Suite 450 in Los Angeles, California (i.e., SUBJECT PREMISES 3).

      f.   On or about January 30, 2018, AVENATTI filed a declaration in the 2017 EA Bankruptcy. AVENATTI stated under the penalty of perjury that EA LLP "maintains an office in Los Angeles under an arrangement with The X-Law Group, P.C. ("X-Law Group") where X-Law Group is the primary tenant."

      g.   On March 7, 2019, AVENATTI filed a Voluntary Petition for Non-Individuals Filing for Bankruptcy on behalf of EA LLP in In re The Trial Group, LLP a/k/a Eagan Avenatti, LLP, No. 8:19-BK-10822 (C.D. Cal.) (the "2019 EA Bankruptcy").[20] The bankruptcy petition identifies the debtor's address as 1910 Sunset Boulevard, Suite 450 in Los Angeles, California (i.e., SUBJECT PREMISES 3).

      h.   On March 7, 2019, AVENATTI filed a Notice of Bankruptcy Filing on behalf of EA LLP in In re: Eagan Avenatti, LLP, No. 8:18-CV-10644-VAP-KES (C.D. Cal.). The attorney caption on the Notice of Bankruptcy Filing identifies AVENATTI's address as "1910 Sunset Boulevard, Suite 450," in Los Angeles, California (i.e., SUBJECT PREMISES 3).

---

   [20]  The 2019 EA Bankruptcy petition identifies the debtor as The Trial Group, LLP, but indicates that it was previously known as EA LLP. This petition appears to have been filed for the specific purpose of avoiding a judgment debtor exam of AVENATTI that had been scheduled for March 8, 2019, in In re: Eagan Avenatti, LLP, No. 8:18-CV-10644-VAP-KES (C.D. Cal.). AVENATTI did not have authorization to file such a petition because in February 2019 a receiver had been appointed to oversee EA LLP's business affairs and had the "sole authority regarding whether to file a petition for bankruptcy." On March 13, 2019, the Bankruptcy Court dismissed the 2019 EA Bankruptcy on those grounds.

   2.   X-Law Group's Involvement in Suspicious Financial
        Transactions

   31.   As detailed in my February 2019 affidavit (Ex. 1),
IRS-CI's investigation to date has revealed the following facts
establishing that AVENATTI has used X-Law Group to conduct a
number of suspicious financial transactions:

        a.   On or about November 2, 2015, AVENATTI caused
approximately $4,600,000 of the proceeds of the sale of his
residence in Laguna Beach, California, to be transferred from
GBUS CB&T Account 2240 to X-Law Group.  (See Ex. 1, ¶ 62.)

        b.   On or about November 3, 2015, X-Law Group then
transferred approximately $3,600,000 to GB Auto BofA Account
7412.  (See id.)

        c.   It appears that the remaining $1,000,000 that had
been transferred to X-Law Group was used to pay $1,000,000 in
deposits for AVENATTI's purchase of a residence in Newport
Beach, California.  (See id.)  For example:

        i.   On September 28, 2015, AVENATTI paid a
$200,000 deposit to the escrow company handling the purchase of
the Newport Beach residence ("Escrow Company 1") via a cashier's
check purchased by X-Law Group.  (See Ex. 1, ¶ 63.)

        ii.   On or about November 6, 2015, AVENATTI paid
an additional $800,000 deposit to Escrow Company 1 via two wire
transfers from X-Law Group's IOLTA attorney trust account in the
amounts of $450,000 and $350,000.  (See id.)

### 3.   X-Law Group's Involvement in the Scheme to Defraud M.P. and L.T.

32.   As noted in section VI.D above, X-Law Group's founding partner, MARCHINO was directly involved in discussions with L.T. regarding the approximately $4 million AVENATTI embezzled from M.P. in March 2018.   MARCHINO introduced M.P.'s business manager, L.T., to AVENATTI.   Moreover, between March 2018 and May 2018, MARCHINO sent L.T. well over 50 text messages regarding the money that MP Company 1 transferred to Avenatti CNB Trust Account 4705 to be held in trust for M.P.'s benefit. In a number of these text messages, MARCHINO referenced communications or attempted communications with AVENATTI. Accordingly, there is probably to believe that X-Law Group's and MARCHINO's files and digital devices will contain additional evidence regarding AVENATTI's scheme to defraud M.P.

## VII.  TRAINING AND EXPERIENCE REGARDING TAX OFFENSES AND FRAUD SCHEMES

33.   In addition to the foregoing facts, based on my training, experience, and conversations with other law enforcement agents who have investigated tax offenses and complex fraud schemes, I have learned the following:

a.   Individuals who carry out complex fraud schemes or commit tax offenses often use computers, cellular telephones, and mobile "smart phones" to conduct their fraudulent activities.   For example, such individuals often use computers, cellular telephones, and mobile smart phones to conduct online banking, the records of which may be stored on digital devices rather than paper records, and to exchange communications,

47

including email and text messages.  Here, as noted above, I know that AVENATTI, REGNIER, and others, such as MARCHINO from X-Law Group, frequently conducted business via email and text message.

b.   Individuals who carry out complex fraud schemes or commit tax offenses often use USB storage devices (commonly referred to as thumb-drives or memory sticks) and external hard drives to store financial records, including banking records and statements, other financial account records, checks, balances, transactions, records of purchases, records reflecting the transfer of assets, and records which are maintained, stored, and utilized to conduct online banking activities.

c.   Businesses, including law firms, often maintain servers that host email accounts for their employees, and that emails may be stored exclusively on those servers.  In other instances, emails may be stored in the "cloud" or directly on employees' computers.  For example, in this case, I know that important information was exchanged over email, including communications between AVENATTI or REGNIER and GBUS employees or business partners.

d.   Individuals who engage in fraud schemes or commit tax offenses often keep records of their fraudulent activities, including financial records, fraudulent documents, and electronic communications, on computers, USB drives, external hard drives, servers, or other digital devices for years after the fraudulent scheme has been completed.

e.   Businesses, including law firms, commonly maintain paper records like bank statements, wire records,

receipts, expense reports, ledgers, balance sheets, income statements, investment agreements, and other financial documents commonly used in fraudulent schemes on their premises.

f. Lawyers and individuals who work for law firms often use portable laptop computers, mobile smart phones, or other digital devices to work remotely, including from their residences or while traveling. For example, in this case, I have reviewed records demonstrating that AVENATTI sent emails, text messages, or other communications late at night or while traveling.

## VIII.   POTENTIAL PRIVILEGE ISSUES

34. As noted herein, AVENATTI is a licensed attorney, REGNIER worked or works as a paralegal for AVENATTI and for EA LLP, and X-Law Group is an active law-firm. I also understand that at various times AVENATTI, EA LLP, and/or A&A may have had attorney-client relationships with other attorneys, including the following law firms: (a) Foster Pepper PLLC; (b) Osborn Machler PLLC; (c) Eisenhower Carlson PLLC; (d) Talmadge/Fitzpatrick/Tribe, PPLC; (e) The Brager Tax Law Group; (f) SulmeyerKupetz; (g) Baker & Hostetler LLP; (h) Shulman Hodges & Bastian LLP; (i) Legal & Tax Consulting Group; (j) Pachulski Stang Ziehl & Jones LLP; (k) Foley & Lardner LLP; (l) Raines Feldman, LLP; and (m) Pansky Markle Attorneys at Law.

35. While the proposed search warrant primarily seeks financial records and non-privileged information there is a significant likelihood that the SUBJECT PREMISES will contain

documents and records that are covered by the attorney-client privilege or attorney-work-product doctrine.   Accordingly, Attachments B-1, B-2, and B-3 to the proposed search warrants contains specific procedures designed to avoid unnecessary disclosures of any privileged attorney-client communications or attorney-work-product.

36.   The privileged information sought by the proposed search warrant is limited to three former clients or potentials clients of AVENATTI, EA LLP, and A&A:   (a) GBUS; (b) G.B.; and (c) M.P. and L.T.   Each of these clients, however, have already executed, or indicated through counsel that they will execute, written waivers of the attorney-client-privilege.

a.   First, as noted in my February 2019 affidavit, on February 19, 2019, the Chapter 7 bankruptcy trustee for GBUS (the "GBUS Trustee") executed a written waiver of the attorney-client privilege as to any communications between GBUS's officer, directors, employees, and agents, and any lawyer acting on GBUS's behalf, including any communications with AVENATTI. (Ex. 1, ¶ 83.a.)   A copy of the GBUS Trustee's written waiver of the attorney-client privilege was attached as Exhibit 1 to my February 2019 affidavit.

b.   Second, on March 18, 2019, G.B. executed a written waiver of the attorney-client privilege and attorney-work-product protections as to any legal advice G.B. sought or received from EA LLP, AVENATTI, and any other current or former EA LLP officers, directors, employees, or agents.   G.B. also consented to the government's search of any of EA LLP's or

AVENATTI's files relating to EA LLP's and AVENATTI's representation of G.B.  A copy of the G.B.'s written waiver of the attorney-client privilege is attached hereto as Exhibit 3.

c.   Third, counsel for M.P. and L.T. informed the government that M.P. and L.T. are both willing to execute written waivers of the attorney-client privilege and attorney-work-product protections as to legal advice M.P. and L.T. sought or received from EA LLP, AVENATTI, MARCHINO, and/or any other current or former officers, directors, employees, or agents of EA LLP.  M.P. and L.T. are also willing to consent to the government's search of the files of EA LLP, AVENATTI, and MARCHINO relating to the representation of M.P. and L.T.  M.P. and L.T. are expected to execute the written waivers of the attorney-client privilege within the next seven days.

37.  I am aware that AVENATTI represented the plaintiff in Stephanie Clifford v. Donald J. Trump, No. 2:18-CV-2217-SJO-FFM (C.D. Cal.), a lawsuit against the President of the United States.  I am also aware that AVENATTI represented Julie Swetnick, an individual who accused United States Supreme Court Justice Brett Kavanaugh of sexual assault in connection with Justice Kavanaugh's confirmation hearing in or around September 2018.  Given the likelihood that the SUBJECT PREMISES may contain privileged information regarding these representations, which are irrelevant to this investigation, Attachments B-1, B-2, and B-3 to the proposed search warrants specifically requires, in addition to the procedures to avoid unnecessary disclosure of attorney-client privileged materials and attorney-

work-product, that any materials relating to AVENATTI's representation of Ms. Clifford or Ms. Swetnick that are identified by the Privilege Review Team, other than financial and accounting records identified in paragraphs 1.d, 1.f, 1.g, and 1.r of Attachments B-1, B-2, and B-3, be segregated and not further reviewed.[21]

38.   Attachments B-1, B-2, and B-3 to the proposed search warrants also set forth a procedure to allow AVENATTI and others to seek the appointment of a special master within seven days of the execution of the proposed search warrants.  Although the government does not believe that the appointment of a special master would be necessary in this investigation, the government has included this provision to ensure that any such request is handled in a timely manner and does not unnecessarily delay IRS-CI's ongoing criminal investigation.

## IX.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES[22]

39.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I

---

[21]   Other than non-privileged financial or accounting records that may reference these representations, the only documents or records relating to these representations that may fall within the scope of the items to be seized would likely be engagement letters and/or client billing records.   Nevertheless, due the political nature of these representations and because such records are irrelevant to this investigation, the privilege review protocols set forth in Attachments B-1, B-2, and B-3 to the proposed warrants calls for any such records to be segregated and not further reviewed once identified.

[22] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as

know that the following electronic evidence, inter alia, is often retrievable from digital devices:

    a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

    b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the

_____

paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

40. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so

many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

41.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after

a certain number of unsuccessful unlock attempts.  Thus, the
opportunity to use a biometric unlock function even on an
enabled device may exist for only a short time.  I do not know
the passcodes of the devices likely to be found in the search.

    c.   Thus, the warrant I am applying for would permit
law enforcement personnel to, with respect to any device that
appears to have a biometric sensor and falls within the scope of
the warrant: (1) depress AVENATTI's, REGNIER's, and MARCHINO's
thumbs and/or fingers on the device(s); and (2) hold the
device(s) in front of AVENATTI's, REGNIER's, and MARCHINO's
faces with their eyes open to activate the facial-, iris-,
and/or retina-recognition feature.

## X.   REQUEST FOR SEALING

    42.  I request that the search warrant, the search warrant
application, and this affidavit be kept under seal to maintain
the integrity of this investigation until further order of the
Court, or until the government determines that these materials
are subject to its discovery obligations in connection with
criminal proceedings, at which time they may be produced to
defense counsel.  I make this request for several reasons.

    a.   First, this criminal investigation is ongoing and
is neither public nor known to AVENATTI and other subjects of
the investigation.  Disclosure of the search warrant,
application, and this affidavit could cause AVENATTI and others
to accelerate any existing or evolving plans to, and give them
an opportunity to, destroy or tamper with evidence, tamper with

or intimidate witnesses, change patterns of behavior, or notify confederates.

   b.   Second, based on evidence collected to date and described herein, there is probable cause to believe that AVENATTI took a number of affirmative actions to obstruct the IRS civil collection action relating to GBUS's unpaid payroll taxes by, among other things, lying to RO 1, changing contracts, merchant accounts, and bank account information to avoid liens and levies imposed by the IRS, and instructing employees to deposit over $800,000 in cash from Tully's stores, which were owned and operated by GBUS, into a bank account associated with a separate entity to avoid liens and levies by the IRS.  If AVENATTI were to learn of the instant investigation he might engage in similarly obstructive conduct.

   c.   Third, a number of former GBUS employees have expressed concerns that AVENATTI might attempt to retaliate against them if he learned they were cooperating with the government's investigation.

   d.   Fourth, there is a possibility that some evidence relating to GBUS's operations may have already been lost when GBUS was evicted from its corporate offices and AVENATTI refused to pay the bill for GBUS's cloud-based server.  Although IRS-CI has been able to obtain some GBUS records, including the data stored on the SUBJECT DEVICES, from other sources, AVENATTI's apparent willingness to allow GBUS records to be lost or destroyed raises a concern that, were AVENATTI to learn of the

instant investigation, he might not hesitate to destroy any remaining GBUS records and other relevant evidence.

e. <u>Fifth</u>, the government is still attempting to locate additional documentary evidence that is relevant to the investigation, including emails and electronic records that may be stored by AVENATTI, EA LLP, A&A, or other related entities. If alerted to the government's investigation prior to the execution of the proposed search warrants, it is therefore possible that AVENATTI would attempt to destroy such records and that the government would have no other means to obtain this evidence.

43. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

///

///

///

## XI. **CONCLUSION**

44.   For all the reasons described above, there is probable cause to believe that the items listed in Attachments B-1 through B-3, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses will be found at the SUBJECT PREMISES, as described in Attachments A-1 through A-3.

/s/

_____
Remoun Karlous, Special Agent
Internal Revenue Service –
Criminal Investigation

Subscribed to and sworn before me
this ____ day of March 2019.

/s/

_____
HONORABLE DOUGLAS F. MCCORMICK
UNITED STATES MAGISTRATE JUDGE

**DOUGLAS F. McCORMICK**

59

# EXHIBIT 1

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the*<br>*person by name and address)*<br><br>Seven Digital Devices in the Custody of the Internal<br>Revenue Service –Criminal Investigation in Laguna<br>Niguel, California | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No. 8:19-MJ-103 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

  ☒ evidence of a crime;

  ☒ contraband, fruits of crime, or other items illegally possessed;

  ☒ property designed for use, intended for use, or used in committing a crime;

  ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of:

| Code Section | Offense Description |
|---|---|
| 26 U.S.C. § 7201 | Attempt to Evade or Defeat Tax |
| 26 U.S.C. § 7202 | Willful Failure to Collect or Pay Over Tax |
| 26 U.S.C. § 7203 | Willful Failure to Pay Tax or File Return |
| 26 U.S.C. § 7212 | Interference with Administration of Internal Revenue Laws |
| 18 U.S.C. § 152 | Concealment of Assets in Bankruptcy |
| 18 U.S.C. § 157 | Bankruptcy Fraud |
| 18 U.S.C. § 371 | Conspiracy |
| 18 U.S.C. § 1001 | False Statements |
| 18 U.S.C. § 1014 | False Statement to a Bank or Other Federally Insured Institution |
| 18 U.S.C. § 1028A | Aggravated Identity Theft |
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1344 | Bank Fraud |
| 18 U.S.C. § 1957 | Money Laundering |

///

///

///

The application is based on these facts:

    *See attached Affidavit*

    ☒ Continued on the attached sheet.

☐ Delayed notice of_____days (*give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/
_____
*Applicant's signature*

IRS CI Special Agent Remoun Karlous
_____
*Printed name and title*

Sworn to before me and signed in my presence.

**DOUGLAS F. McCORMICK**
_____
Date: February 22, 2019
*Judge's signature*

City and state: Santa Ana, CA
United States Magistrate Judge Douglas F. McCormick
_____
*Printed name and title*

AUSAs:  Julian L. André (213.894.6683) & Brett A. Sagel (714.338.3598)

Case 8:19-mj-00103-DUTY *SEALED*  Document 4-1 *SEALED*  Filed 02/22/19  Page 3 of 184  Page ID #:237

## ATTACHMENT A

PROPERTY TO BE SEARCHED

Forensic images of the following digital devices (the "SUBJECT DEVICES"), which are currently maintained in the custody of the Internal Revenue Service-Criminal Investigation ("IRS-CI") in Laguna Niguel, California:

1.  Dell XPS 128 GB Samsung SSD, bearing serial number S1D2NSAG5000777, provided to IRS-CI by M.E. on or about October 22, 2018 ("SUBJECT DEVICE 1");

2.  Dell Precision, Model M4800, bearing service tag number 252M262, provided to IRC-CI by S.F. on or about October 21, 2018 ("SUBJECT DEVICE 2");

3.  Seagate External Hard Drive, model number SRD00F1, bearing serial number NA44HLQH, provided to IRS-CI by M.G. on or about October 22, 2018 ("SUBJECT DEVICE 3");

4.  Samsung flash drive  provided to IRS-CI by V.S. on or about October 31, 2018 ("SUBJECT DEVICE 4");

5.  Seagate Hard Drive, bearing serial number 5VJC1GXV provided to IRS-CI by A.G. on or about November 13, 2018 ("SUBJECT DEVICE 5");

6.  Veeam 2GB flash drive provided to IRS-CI by A.G. on or about November 13, 2018 ("SUBJECT DEVICE 6"); and

7.  Seagate Hard Drive, bearing serial number 5VJC1GXV provided to IRS-CI by A.G. on or about November 20, 2018 ("SUBJECT DEVICE 7").

## ATTACHMENT B

### I.   ITEMS TO BE SEIZED

1.   The items to be seized are evidence, contraband, fruits, and/or instrumentalities of violations of 26 U.S.C. § 7201 (attempt to evade or defeat tax); 26 U.S.C. § 7202 (willful failure to collect or pay over tax); 26 U.S.C. § 7203 (willful failure to pay tax or file return); 26 U.S.C. § 7212 (interference with administration of internal revenue laws); 18 U.S.C. § 152 (concealment of assets in bankruptcy); 18 U.S.C. § 157 (bankruptcy fraud); 18 U.S.C. § 371 (conspiracy); 18 U.S.C. § 1001 (false statements); 18 U.S.C. § 1014 (false statement to a bank or other federally insured institution); 18 U.S.C. § 1028A (aggravated identity theft); 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 1344 (bank fraud); and 18 U.S.C. § 1957 (money laundering) (the "Subject Offenses"), namely:

a.   Records, documents, correspondence, programs, applications, or materials from January 2013 through September 2018 that evidence, discuss, reflect, or relate to the ownership of Global Baristas US, LLC ("GBUS"); Global Baristas, LLC ("GB LLC"); GB Autosport, LLC ("GB Auto"); GB Hospitality LLC ("GB Hospitality"); Doppio Inc. ("Doppio"); Eagan Avenatti LLP ("EA LLP"); and Avenatti & Associates, APC ("A&A") (collectively, the "Subject Entities").

i

b.    Records, documents, correspondence, programs, applications, or materials from January 2013 through September 2018 that evidence, discuss, reflect, or relate to the sale or purchase of TC Global, Inc. or Tully's Coffee.

c.    Records, documents, correspondence, programs, applications, or materials from January 2013 through September 2018 that evidence, discuss, reflect, or relate to the purchase or sale of GBUS, GB LLC, or Doppio.

d.    Records, documents, correspondence, programs, applications, or materials from January 2013 through September 2018 that evidence, discuss, reflect, or relate to AVENATTI's control or management of any of the Subject Entities.

e.    Records, documents, correspondence, programs, applications, or materials from January 2013 through September 2018 that evidence, discuss, reflect, or relate to the organizational or management structure of any of the Subject Entities.

f.    Records, documents, correspondence, programs, applications, or materials from January 2013 through September 2018 that evidence, discuss, reflect, or relate to the finances of any of the Subject Entities, including assets, liabilities, accounts receivable, and accounts payable.

g.    Records, documents, correspondence, programs, applications, or materials from January 2013 through September

2018 that evidence, discuss, reflect, or relate to value of GBUS or GB LLC.

   h.   Records, documents, correspondence, programs, applications, or materials from January 2013 through September 2018 that evidence, discuss, reflect, or relate to the accounting records for GBUS and GB LLC, including any Microsoft Dynamics NAV accounting data, files, or records.

   i.   Records, documents, correspondence, programs, applications, or materials from January 2013 through September 2018 that evidence, discuss, reflect, or relate to GBUS employee handbooks or manuals, employment contracts, compensation records, and employee lists.

   j.   Records, documents, correspondence, programs, applications, or materials from January 2013 through September 2018 that evidence, discuss, reflect, or relate to the personal finances of Michael J. Avenatti ("AVENATTI"), including information relating to AVENATTI's assets, debts, income, expenses, and net worth.

   k.   Records, documents, correspondence, programs, applications, or materials from January 2013 through September 2018 that evidence, discuss, reflect, or relate to any financial transactions, including any proposed or potential financial transactions, involving any of the Subject Entities and/or AVENATTI.

l.    Records, documents, correspondence, programs, applications, or materials from January 2013 through September 2018 that evidence, discuss, reflect, or relate to financial decisions AVENATTI made on behalf of any of the Subject Entities, including decisions to authorize payments on behalf of any of the Subject Entities and transfer money to or from any of the Subject Entities.

m.    Records, documents, correspondence, programs, applications, or materials from January 2013 through September 2018 that evidence, discuss, reflect, or relate to any loans or other financing agreements, including any proposed or potential loans or other financing agreements, involving any of the Subject Entities and/or AVENATTI.

n.    Records, documents, correspondence, programs, applications, or materials from January 2013 through September 2018 that evidence, discuss, reflect, or relate to the payroll and tax preparation services that Ceridian HCM Inc. ("Ceridian") provided to GBUS, including any records, documents, correspondence, programs, applications, or materials evidencing, discussing, reflecting, or relating to changes in the payroll and tax services to be provided by Ceridian.

o.    Records, documents, correspondence, programs, applications, or materials from January 2013 through September 2018 that evidence, discuss, reflect, or relate to the federal,

iv

Case 8:19-mj-00103-DUTY *SEALED*   Document 4-1 *SEALED*   Filed 02/22/19   Page 8 of
184   Page ID #:242

state, and/or local tax obligations, tax returns, tax
liabilities, or tax payments of any of the Subject Entities
and/or AVENATTI.

p.   Records, documents, correspondence, programs,
applications, or materials from January 2013 through September
2018 that evidence, discuss, reflect, or relate to any liens,
levies, garnishments, judgments, encumbrances, or tax-related
investigations or actions associated with any of the Subject
Entities and/or AVENATTI.

q.   Records, documents, correspondence, programs,
applications, or materials from January 2013 through September
2018 that evidence, discuss, reflect, or relate to GBUS's and GB
LLC's merchant credit card processing accounts (the "merchant
accounts"), including contracts, agreements, account
applications, and correspondence regarding changes to the
merchant accounts.

r.   Records, documents, correspondence, programs,
applications, or materials from January 2013 through September
2018 that evidence, discuss, reflect, or relate to any of the
Subject Entities' and/or AVENATTI's contractual relationships,
including drafts and final versions of any executed, proposed,
or potential contracts and agreements, bills of sale,
correspondence regarding payments, and correspondence regarding
the cancellation or modification of contracts and/or agreements.

s.   Records, documents, correspondence, programs, applications, or materials from January 2013 through September 2018 that evidence, discuss, reflect, or relate to changes in any of the Subject Entities' and/or AVENATTI's bank account information.

t.   Any SUBJECT DEVICE which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses and forensic copies thereof.

u.   With respect to any SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

vi.   passwords, encryption keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.   records of or information about Internet Protocol addresses used by the device;

ix.   records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "correspondence," "programs," "applications," and "materials" include records, documents, correspondence, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

## II.   SEARCH PROCEDURES FOR HANDLING POTENTIALLY PRIVILEGED INFORMATION ON THE SUBJECT DEVICES

3.   In searching the SUBJECT DEVICES (including the forensic copies thereof), the following procedures will be followed at the time of the search in order to avoid unnecessary disclosures of any privileged attorney-client communications or attorney work product.

4.   Law enforcement personnel conducting the investigation and search and other individuals assisting law enforcement personnel in the search (the "Search Team") have already obtained custody of the SUBJECT DEVICES, which are capable of containing evidence of the Subject Offenses, or capable of containing data falling within the scope of the items to be seized.   The Search Team shall facilitate the transfer of the SUBJECT DEVICES to the "Privilege Review Team" (previously designated individuals not participating in the investigation of the case).   The Privilege Review Team, including a Privilege Review Team Assistant United States Attorney ("PRTAUSA") or PRTAUSAs, will then review the SUBJECT DEVICES as set forth herein.   The Search Team will review only data from the SUBJECT DEVICES that has been released by the Privilege Review Team to the Search Team.

5.   The Privilege Review Team will, in their discretion, either search each SUBJECT DEVICE where it is currently located

or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

6.     The Privilege Review Team and the Search Team shall complete the search discussed herein as soon as is practicable but not more than 180 days from the date of execution of the warrant.  The government will not search the SUBJECT DEVICES beyond this 180-day period without obtaining an extension of time order from the Court.

7.     The Search Team will provide the Privilege Review Team and/or appropriate litigation support personnel[55] with a list of "privilege key words" to search the SUBJECT DEVICES for communications, data, or documents relating to the following law firms:  (a) Foster Pepper PLLC; (b) Osborn Machler PLLC; (c) Eisenhower Carlson PLLC; (d) Talmadge/Fitzpatrick/Tribe, PPLC; and (e) Brager Tax Law Group.  Such "privilege key words" shall include specific words like "Foster Pepper," "Osborn," "Machler," "Eisenhower," "Carlson," "Talmadge," "Fitzpatrick," "Tribe," "Brager," as well as other email addresses and domain names associated with those individuals and law firms.  Because the Chapter 7 bankruptcy trustee for GBUS (the "GBUS Trustee") has executed a waiver of the attorney-client privilege as to all

---

[55] Litigation support personnel and computer forensics agents or personnel, including IRS Computer Investigative Specialists, are authorized to assist both the Privilege Review Team and the Search Team in processing, filtering, and transferring data contained on the SUBJECT DEVICES.

communications between GBUS's officer, directors, employees, and agents, and any lawyer acting on GBUS's behalf (see Affidavit ¶ 83.a, Ex. 1), including AVENATTI, the "privilege key words" need not include specific words designed to capture all communications with AVENATTI or his law firms, EA LLP and A&A, or standard privilege terms.

8.   The Privilege Review Team will segregate and will not search or review the contents of AVENATTI's GBUS email accounts, including:  (1) MichaelA@globalbaristas.com; and (2) MAvenatti@globalbaristas.com.  Such data will be maintained under seal by the investigating agency without further review absent subsequent authorization as set forth in paragraph 12 below.

9.   The Privilege Review Team will conduct an initial review of the data on the SUBJECT DEVICES using the "privilege key words," and by using search protocols specifically chosen to identify documents or data containing potentially privileged information.  The Privilege Review Team may subject to this initial review all of the data contained in the SUBJECT DEVICES capable of containing any of the items to be seized.  Documents or data that are identified by this initial review as not potentially privileged may be given to the Search Team.

10.  All documents or data that the initial review identifies as containing any of the "privilege key words" will

x

be reviewed by a Privilege Review Team member to confirm that the documents or data contain potentially privileged information.  Documents or data that are determined by this secondary review not to be potentially privileged may be given to the Search Team.  Documents or data that are determined by this review to be potentially privileged or privileged will be given to the United States Attorney's Office for further review by the PRTAUSA(s).  Documents or data identified by the PRTAUSA(s) after further review as not potentially privileged may be given to the Search Team.  If, after further review, the PRTAUSA(s) determines it to be appropriate, the PRTAUSA may apply to the Court for a finding with respect to particular documents or data that no privilege, or an exception to the privilege, applies.  Documents or data that are the subject of such a finding may be given to the Search Team.  In such an instance, the PRTAUSA(s) shall conduct a review of the documents or data to determine whether they fall within the scope of the items to be seized prior to applying to the Court for relief. Documents or data identified by the PRTAUSA(s) after review as privileged will be maintained under seal by the investigating agency without further review absent subsequent authorization as set forth in paragraph 12 below.

11.  The Privilege Review Team may, in its discretion, also use "scope key words" to search any documents or data that were

identified as potentially privileged using the "privilege key words" if the Privilege Review Team determines that such a procedure would allow the Privilege Review Team to complete its review of potentially privileged documents more effectively and efficiently.  The Privilege Review Team may also, in its discretion, apply the "scope key words" to a subset of the potentially privileged data.   At the Privilege Review Team's request, the Search Team may provide the Privilege Review Team and/or appropriate litigation support personnel with a list of "scope key words" designed to search for data relating to the items to be seized.  These "scope key words" may then be applied to the potentially privileged data identified by using the "privilege key words."  The Privilege Review Team may conduct a detailed quality check on any data that did not contain the "scope key words" to ensure that the scope key word search is effective.  Additional "scope key words" designed to locate the items to be seized may also be applied at the discretion of the PRTAUSA(s).  Any data or documents that contain both any of the "privilege key words" and any of "scope key words" shall be then reviewed by the Privilege Review Team and the PRTAUSA(s) in accordance with the procedures set forth in paragraph 9 above. Documents and data that are identified by the "scope key word" searches and quality checks as falling outside the scope of the warrant will be maintained under seal as set forth in paragraph